# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE DELL TECHNOLOGIES INC. | ) | Consol. C.A. No. |
| CLASS V STOCKHOLDERS LITIGATION | ) | 2018-0816-JTL |

## MEMORANDUM OPINION

Date Submitted: March 13, 2020
Date Decided: June 11, 2020

Ned Weinberger, Derrick Farrell, Mark Richardson, Thomas Curry, LABATON SUCHAROW LLP, Wilmington, Delaware; David M. Cooper, Silpa Maruri, Dominic Pody, James Meehan, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; Dominic Minerva, LABATON SUCHAROW LLP, New York, New York; *Co-Lead Counsel for Plaintiffs.*

Peter B. Andrews, Craig J. Springer, David Sborz, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Chad Johnson, Noam Mandel, ROBINS GELLER RUDMAN & DOWD LLP, New York, New York; Jeremy S. Friedman, David F.E. Tejtel, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York; *Additional Counsel for Plaintiffs.*

Gregory P. Williams, John D. Hendershot, Susan M. Hannigan, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; John L. Latham, Cara M. Peterman, ALSTON & BIRD LLP, Atlanta, Georgia; Gidon M. Caine, ALSTON & BIRD LLP, Palo Alto, California; Charles W. Cox, ALSTON & BIRD LLP, Los Angeles, California; *Counsel for Defendants Michael Dell, Egon Durban, Simon Patterson, and Ellen Kullman.*

Martin S. Lessner, Elena C. Norman, James M. Yoch, Jr., Lauren Dunkle Fortunato, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; James G. Kreissman, Stephen P. Blake, David Elbaum, SIMPSON THACHER & BARTLETT LLP, New York, New York; *Counsel for Defendant Silver Lake Group LLC.*

Kevin G. Abrams, Michael A. Barlow, April M. Kirby, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Michele D. Johnson, Kristin N. Murphy, Ryan A. Walsh, LATHAM & WATKINS LLP, Costa Mesa, California; *Counsel for Defendants William Green and David Dorman.*

**LASTER, V.C.**

In 2013, Michael Dell and Silver Lake Group LLC took Dell, Inc. private through a leveraged buyout. The privately held successor of Dell, Inc. is Dell Technologies Inc. (the "Company"), which Mr. Dell[1] and Silver Lake control.

In 2016, the Company sought to acquire EMC Corporation, a data-storage firm. One of EMC's most valuable assets was its ownership of 81.9% of the equity of VMware, Inc., a publicly traded cloud-computing and virtualization company. The Company wanted to pay cash to acquire all of EMC, but the Company remained highly indebted after the leveraged buyout and could not fund an all-cash deal. Instead, the Company proposed to acquire EMC using a combination of cash and newly issued shares of Class V common stock, which would trade publicly and track the performance of a portion of the equity stake in VMware that the Company would own as a result of the deal.

The Company and EMC ultimately completed a transaction that valued EMC at $67 billion. Each share of EMC common stock was converted into the right to receive $24.05 in cash plus 0.11146 of a Class V share. The Company listed the Class V shares on the New York Stock Exchange where they traded under the symbol "DVMT."

The Class V shares were designed, in the aggregate, to track the performance of 65% of the 81.9% stake in VMware that the Company owned after acquiring EMC. In theory, the Class V stock tracked 53.235% of the value of VMware. In actuality, the Class

---

[1] My usual practice is to identify individuals by their last names without honorifics. In this case, the risk of confusion between Mr. Dell and the Company warrants an exception. The same risk does not exist for other individuals, who are identified without honorifics. No disrespect is intended.

V stock did not track the value of VMware, at least not as measured by VMware's publicly traded shares. From the outset, the Class V shares traded at a thirty percent discount to VMware's publicly traded shares. One reason for the discount was that the Class V shares were subject to a conversion right: If the Company listed its Class C shares on a national exchange, then the Company could forcibly convert the Class V shares into Class C shares pursuant to a pricing formula (a "Forced Conversion").

After completing the EMC acquisition, the Company began exploring ways to consolidate its ownership of VMware. There were three logical paths: (i) a transaction with VMware, (ii) a redemption of the Class V stock, or (iii) a Forced Conversion.

In January 2018, the Company's board of directors (the "Board") charged one of the existing committees of the Board with negotiating a redemption of the Class V shares. Endeavoring to qualify for the safe harbor established by *Kahn v. M & F Worldwide Corp.* (*MFW*), 88 A.3d 635 (Del. 2014), the Board conditioned any redemption or similar transaction on both (i) committee approval, and (ii) approval from holders of a majority of the outstanding Class V shares. The Company reserved the right to bypass the *MFW* process by engaging in a Forced Conversion.

After the Company and the committee discussed valuation, the committee's legal advisor identified a conflict of interest for one of the committee's members. In March 2018, the Board created a special committee that excluded the conflicted member. The Board again conditioned any redemption or similar transaction on compliance with *MFW*, but again reserved the right to bypass the *MFW* process by engaging in a Forced Conversion.

2

Over the next three months, the Company negotiated with the committee. During this process, both Company representatives and the committee's advisors repeatedly told the committee that if they did not agree to a negotiated redemption, then the Company would proceed unilaterally with a Forced Conversion. Both Company representatives and the committee's advisors stressed that a Forced Conversion was the least attractive option for the Class V stockholders.

On July 1, 2018, the committee agreed to a negotiated redemption which valued the Class V shares in the aggregate at $21.7 billion (the "Committee-Sponsored Redemption"). Each holder of Class V stock could opt to receive (i) shares of newly issued Class C common stock valued at $109 per share, or (ii) $109 per share in cash, with the aggregate amount of cash capped at $9 billion and subject to proration.

Large holders of Class V stock objected to the Committee-Sponsored Redemption, and the Company did not believe that the Class V stockholders would approve it. Rather than negotiating further with the committee, the Company began negotiating directly with six large holders of Class V stock (the "Stockholder Volunteers"). While doing so, the Company took steps publicly to prepare for a Forced Conversion, underscoring the reality of this alternative.

After four and a half months, the Company reached agreement with the Stockholder Volunteers (the "Stockholder-Negotiated Redemption"). The new deal valued the Class V shares in the aggregate at $23.9 billion. Each holder of Class V stock could opt to receive (i) shares of newly issued Class C common stock valued at $120 per share, or (ii) $120 per share in cash, with the aggregate amount of cash capped at $14 billion. The Stockholder-

3

Negotiated Redemption also provided the Class C stockholders with the right to elect a member of the Board.

The committee had not involved itself in the negotiations between the Company and the Stockholder Volunteers. On the evening of November 14, 2018, the Company informed the committee of the terms of the Stockholder-Negotiated Redemption. The committee met for an hour and approved it.

During a special meeting of the Class V stockholders on December 11, 2018, the Stockholder-Negotiated Redemption received approval from unaffiliated holders of 61% of the outstanding Class V shares. Two weeks later, the Stockholder-Negotiated Redemption closed.

The plaintiffs are former holders of Class V stock who contend that Mr. Dell, Silver Lake, and the members of the Board breached their fiduciary duties when negotiating and approving the Stockholder-Negotiated Redemption. According to the plaintiffs, it is reasonably conceivable that the Stockholder-Negotiated Redemption was not entirely fair.

The defendants moved to dismiss the complaint under Rule 12(b)(6) for failure to state a claim on which relief can be granted. All of the defendants claim that the Stockholder-Negotiated Redemption complied with the requirements of *MFW* and is therefore subject to the irrebutable version of the business judgment rule. The only theoretically viable claim under that version of the business judgment rule is a claim for waste, which the plaintiffs have not tried to assert. Accordingly, the defendants say, the complaint should be dismissed.

4

This decision rejects the defendants' pleading-stage contention that *MFW* necessarily applies. The complaint alleges facts that make it reasonably conceivable that the defendants failed to comply with *MFW*'s requirements, making entire fairness the operative standard of review. The defendants do not contend that the complaint fails to state a claim if entire fairness applies.

Separately, defendants Ellen Kullman, David Dorman, and William Green contend that the complaint fails to state a non-exculpated claim against them. It is reasonably conceivable for purposes of pleading-stage analysis that Dorman and Green could be subject to liability for non-exculpated claims. It is not reasonably conceivable that Kullman could be subject to liability for a non-exculpated claim. This is necessarily an interlocutory ruling, and Kullman's dismissal can be revisited if discovery establishes a basis for a non-exculpated claim against her.

## I. FACTUAL BACKGROUND

The facts are drawn from the currently operative complaint and documents incorporated by reference, including SEC filings and documents the plaintiffs obtained using Section 220 of the Delaware General Corporation Law, 8 *Del. C.* § 220. Citations in the form "Ex. — at — " refer to these documents, which the defendants attached as exhibits to their briefs. *See* Dkts. 111–13, 120. At this stage of the proceedings, the complaint's allegations are assumed to be true, and the plaintiffs receive the benefit of all reasonable inferences, including inferences drawn from documents.

5

## A.    The Company

Mr. Dell founded the Company's predecessor in 1983 and took it public in 1988. In 2013, Mr. Dell partnered with Silver Lake to acquire the Company's predecessor through a leveraged buyout. From 1988 until 2004, and again from 2007 to the present, Mr. Dell has served as CEO of the Company or its predecessor.

In 2016, the Company sought to acquire EMC. One of EMC's most valuable assets was its ownership of 81.9% of the equity of VMware. The Company wanted to pay cash to acquire all of EMC, including all of its equity stake in VMware, but the Company remained highly leveraged after the buyout and could not fund an all-cash deal.

Instead, the Company offered to fund the acquisition with a combination of cash and newly issued shares of Class V stock, which would trade publicly and track the performance of a portion of the equity stake in VMware that the Company would acquire in the deal. In September 2016, the Company and EMC completed a transaction that valued EMC at $67 billion. Each share of EMC common stock was converted into the right to receive $24.05 in cash plus 0.11146 of a Class V share.

After the EMC acquisition, Mr. Dell owned shares of Class A common stock that carried ten votes per share and collectively gave him control over 73% of the Company's outstanding voting power. Silver Lake held shares of Class B common stock that also carried ten votes per share and collectively gave Silver Lake control over 23% of the Company's voting power. The Company's employees held shares of Class C common stock, which they received as part of their compensation packages. The Class C common stock carried one vote per share. Collectively, the Class C common stock constituted less

6

than 1% of the Company's voting power. The former stockholders of EMC held shares of Class V common stock. It also carried one vote per share. Collectively, the Class V common stock constituted less than 4% of the Company's voting power. *See* Ex. 2 at 109.[2]

In the aggregate, the Class V shares tracked the performance of 65% of the 81.9% stake in VMware that the Company owned after acquiring EMC (the "Class V Assets"). Consequently, the Class V stock tracked 53.235% of the value of VMware. The Company's other stockholders benefited only from the 35% of the Company's 81.9% stake in VMware that was not part of the Class V Assets. As a result, they benefitted from only 28.665% of the value of VMware. *See* Compl. ¶ 49; *see* Ex. 2 at 3, 16–18.

After the EMC deal and during the events giving rise to this litigation, the Board consisted of six directors divided into three classes, defined in the Company's certificate of incorporation as the Group I, II, and III directors. *See* Compl. ¶¶ 52, 53; Ex. 55 §§ 6(b), 15. As the sole holder of the Class A shares, Mr. Dell had the power to elect the single Group II director, who had the right to exercise seven board-level votes. Mr. Dell elected himself. As the sole holder of the Class B shares, Silver Lake had the power to elect the two Group III directors, who each had the right to exercise one-and-a-half board-level votes. Silver Lake elected Egon Durban, the managing partner of Silver Lake, and Simon Patterson, a managing director with the firm. The holders of all of the shares of common

---

[2] The certificate of incorporation authorized the issuance of shares of Class D common stock, which do not have voting rights. The Company had not issued any Class D shares by the time of the events giving rise to this litigation. *See* Ex. 1 at 117; Ex. 55 § 5.2.

7

stock voting together (including the Class A and Class B shares) had the right to elect the three Group I directors, who each had one board-level vote. Mr. Dell thus controlled the election of the Group I directors.

The three Group I directors were Kullman, Dorman, and Green. Kullman is the former Chair and CEO of E. I. du Pont de Nemours and Company. Ex. 1 at 145. Dorman is the former Chairman and CEO of AT&T Corporation and a founding partner of Centerview Capital Technology ("Centerview Capital"), the Silicon Valley-based private equity arm of Centerview Partners LLC, a boutique investment bank. Compl. ¶ 100. Green is the former Chairman and CEO of Accenture plc and Co-CEO and Co-Chairman of GTY Technology Holdings Inc., an investment company co-founded by former EMC directors. *Id.* ¶ 11; Ex. 1 at 145.

The Board created a Capital Stock Committee charged with overseeing the business and financial relationships created by the distinction between the Class V Assets and the remainder of the Company's assets (the "Core Business"). *See* Ex. 2 at 133. Kullman, Dorman, and Green comprised the Capital Stock Committee. Without approval by the Capital Stock Committee, the Board could not reallocate assets between the Class V Assets and the Core Business, allocate acquired assets to one group or another, or accept certain types of investments. *See id.* at 133–34.

**B.    The Conversion Right**

For purposes of the events giving rise to this litigation, a critical feature of the Class V shares was the Company's right to effect a Forced Conversion. The pertinent language of the certificate of incorporation stated,

8

At the option of the [Company], exercisable at any time the Class C Common Stock is then Publicly Traded, the Board of Directors may authorize (the date the Board of Directors makes such authorization, the "Determination Date") that each outstanding share of Class V Common Stock be converted into a number (or fraction) of validly issued, fully paid and non-assessable Publicly Traded shares of Class C Common Stock equal to the amount (calculated to the nearest five decimal places) obtained by multiplying the Applicable Conversion Percentage as of the Determination Date by the amount (calculated to the nearest five decimal places) obtained by dividing (I) the Average Market Value of a share of Class V Common Stock over the 10-Trading Day period ending on the Trading Day preceding the Determination Date, by (II) the Average Market Value of a share of Class C Common Stock over the same 10-Trading Day period.

Ex. 55 § 5.2(r)(1) (the "Conversion Right"). The certificate of incorporation defined "Publicly Traded" as "with respect to shares of capital stock or other securities, that such shares or other securities are traded on a U.S. securities exchange." Ex. 55 at 35.

The existence of the Conversion Right meant that the Company could complete an initial public offering of Class C stock, then exercise the Conversion Right and effectuate a Forced Conversion. If the Company pursued that path, then the superficially simple pricing formula in the Conversion Right created massive uncertainty about what consideration the Class V stockholders would receive. The complaint captures the uncertainty by quoting Columbia Law School Professor Eric Talley, who offered the following public comment on the Forced Conversion:

The IPO-then-convert alternative is a . . . perilous path for [Class V stockholders], due in part to the mammoth unpredictability of the pricing ratio's realized value once triggered . . . . Indeed, having spent several months myself grappling with the pricing formula that governs the Class V / Class C share conversion, I am resigned to the conclusion that it is riddled with enough self-referential circularities and indeterminacies to fry the circuits of even the most capable asset pricing algorithm.

9

Compl. ¶ 61 (internal quotation marks omitted). Even a slight decrease in the relative value of the Class V stock during the 10-trading-day pricing window could cause market participants to anticipate further declines, triggering a sell-off to avoid those declines, and generating a downward spiral. *See id.* ¶ 62; Ex. 55 § 5.2(m)(3)(C)–(D).

Analysts and other commentators perceived that Mr. Dell and Silver Lake could exploit the Conversion Right to their advantage, and they noted that Mr. Dell had not historically been friendly to public stockholders. A Deutsche Bank analyst observed that "[t]he concern that Dell might do something against the interest of VMware or [Class V] stockholders is not hypothetical." Compl. ¶ 58 (internal quotation marks omitted); *see id.* (quoting a market participant as saying that "Michael Dell isn't really shareholder-friendly" (internal quotation marks omitted)).

Given these issues, the Class V stock traded at a discount of approximately 30% relative to the publicly traded shares of VMware. Market participants referred to this as the "Dell Discount." *Id.* ¶¶ 58–59.

## C.    The Company Explores Ways To Eliminate The Tracking Stock.

In August 2017, Mr. Dell and Durban began considering how to consolidate the value of the Company's ownership of VMware. In October 2017, the Company retained The Goldman Sachs Group, Inc. as its financial advisor for that purpose. The Company agreed to pay Goldman Sachs a success fee of $70 million, "reportedly the largest success fee in history." *Id.* ¶ 64.

One option was for the Company to acquire VMware. The Company already controlled VMware through its ownership of 81% of VMware's common stock. The existence of the Class V tracking stock did not alter the Company's control.

In October 2017, both Mr. Dell and Durban contacted VMware to discuss a potential stock-for-stock transaction in which both VMware stockholders and the Class V stockholders would receive the same security. In December 2017, Durban gave a presentation to VMware which argued that the Core Business was worth $35–$48 billion. *See* Ex. 1 at 163. Contemporaneously, the Board approved a valuation for purposes of granting equity awards to employees that valued the Core Business at $19.5 billion. Compl. ¶ 153; *see* Ex. 1 at 163; Ex. 8 at '064.

On January 25, 2018, the Company leaked to *Bloomberg* that it was considering an initial public offering of the Class C stock. Taking that step would enable the Company to exercise the Conversion Right. After the article was published, the trading price of the Class V stock plummeted. Compl. ¶ 133.

## D.     The Path To The Special Committee

On January 31, 2018, Mr. Dell and Goldman Sachs presented the Board with three alternatives for consolidating the Company's ownership of VMware. One option was to acquire VMware outright. Another was to engage in a negotiated redemption of the Class V stock. The third was to list the Class C shares, then engage in a Forced Conversion. *Id.* ¶ 65; *see* Ex. 9 at '105.

At the end of the meeting, the Board charged the Capital Stock Committee with authority over a "Potential Class V Transaction." The members of the Capital Stock

11

Committee were the Company's three outside directors: Kullman, Green, and Dorman. The implementing resolution authorized and directed the Capital Stock Committee

> on behalf of the holders of the Class V Common Stock, to make such investigations as it deems appropriate, evaluate, negotiate and approve or disapprove of any Potential Class V Transaction that may be pursued or proposed by the Board or by VMware, Inc., and make a recommendation to the holders of the Class V Common Stock with respect to any such Potential Class V Transaction that is submitted to a vote of the Class V Common Stock . . . .

Ex. 9 at '106. The Board also resolved

> that the consummation of any Potential Class V Transaction is irrevocably conditioned on both (i) the approval of the Committee and (ii) the affirmative vote of the holders of Class V Common Stock representing a majority of the aggregate voting power of the outstanding shares of Class V Common Stock (excluding any shares beneficially owned by any "affiliate" of the Company as defined by Rule 405 of the Securities Act of 1933, as amended), and the Company shall not consummate any Potential Class V Transaction unless the conditions set forth in both of clause (i) and clause (ii) have been satisfied.

*Id.* at '107.

Notably, the definition of a Potential Class V Transaction did *not* include a Forced Conversion. The resolutions defined the term "Potential Class V Transaction" through the following combination of WHEREAS clauses:

> **WHEREAS,** the Board has determined that it is appropriate and in the best interests of the Company and its stockholders to evaluate potential business opportunities for the Company, including the possibility, without limitation, of a public offering of the Company's Common Stock, a business combination with VMware, Inc., or maintaining the *status quo*;

> **WHEREAS**, such potential business opportunities could include a business consummation with VMware, Inc. or another transaction that if consummated would (i) amend the [Certificate of Incorporation] to change the powers, preferences, rights or terms of the [Class V common stock], and/or (ii) result in the conversion or exchange of all or any portion of the Class V Common Stock into cash or other securities *other than in*

12

*accordance with the terms of the Certificate of Incorporation* (any potential transaction having any of the effects described in clause (i) or (ii) a "Potential Class V Transaction").

*Id.* at '105 (emphasis added). By excluding any transaction consummated "in accordance with the terms of the Certificate of Incorporation," the Board excluded a Forced Conversion from the scope of the authority granted to the Capital Stock Committee. Because the Capital Stock Committee did not have authority over a Forced Conversion, the Board could exercise the Conversion Right at any time. Given the allocation of board-level voting power, Mr. Dell alone controlled whether the Company exercised the Conversion Right.

On February 7, 2018, the Capital Stock Committee retained Latham & Watkins LLP as its legal advisor. On February 15, the Capital Stock Committee retained Evercore as its financial advisor. Evercore had advised EMC in its sale to the Company and had expected the Class V shares to trade at a discount of 0–10% relative to VMware's shares. As noted, the "Dell Discount" instead resulted in the Class V shares trading at a discount of approximately 30% compared to the VMware shares. *See* Compl. ¶¶ 7, 56, 58–59.

Stuart Francis was the lead banker for Evercore. During the weekend of February 7, 2015, just before the Capital Stock Committee retained Evercore, Francis played in the AT&T Pebble Beach Pro-Am golf tournament with Dorman. Francis was in a foursome with Durban's wife and two professional golfers. On February 12, the Capital Stock Committee contacted Evercore. Three days later, they hired Evercore. They had not interviewed any other financial advisors.

13

On February 18, 2018, Evercore and Silver Lake began discussing a potential redemption of the Class V shares. Silver Lake provided Evercore with the same valuation of $35–$48 billion for the Core Business that Durban had given to VMware two months earlier. Compl. ¶ 86; *see* Ex. 1 at 166. Silver Lake also told Evercore that the Company had been "exploring an IPO" in which "[Class V] shares may be converted to . . . Class C shares." Compl. ¶ 138 (internal quotation marks omitted). This was a reference to a Forced Conversion.

On February 20, 2018, the Capital Stock Committee met with its advisors to evaluate Silver Lake's proposal. *Id.* ¶ 86. Evercore discussed the valuations, and Latham reviewed the committee's fiduciary duties. *See* Ex. 1 at 166.

On February 24, 2018, Latham advised Kullman that she should recuse herself because she was a director of Goldman Sachs, and that firm was acting as the Company's financial advisor. Compl. ¶ 87. This created a problem for the Board's plan to use the Capital Stock Committee to vet a Potential Class V Transaction.

On March 6, 2018, the Capital Stock Committee recommended that the Board rescind its grant of authority over a Potential Class V Transaction, create a two-member special committee consisting of Green and Dorman (the "Special Committee"), and re-grant to the Special Committee the authority previously granted to the Capital Stock Committee. *Id.* On March 14, 2018, the Board did just that.

Importantly for this case, the Special Committee received precisely the same authority over a Potential Class V Transaction, which was defined in precisely the same way. *See* Ex. 14. The Special Committee thus did not have authority over a Forced

14

Conversion, and Mr. Dell alone controlled whether the Company exercised the Conversion Right. The Special Committee picked up where the Capital Stock Committee left off and moved forward with Latham and Evercore as its advisors.

## E.     Dual-Track Discussions

While the Special Committee was getting up and running, the Company had continued its discussions with VMware. Now, the Company engaged in dual-track discussions with both VMware and the Special Committee.

On March 12, 2018, Goldman Sachs gave VMware's bankers a presentation that valued the Core Business at $48–$52 billion. Later that afternoon, Goldman Sachs gave the same presentation to Evercore.

On March 20, 2018, the Special Committee met with Evercore. The first item that Evercore discussed with the Special Committee was the Company's ability to engage in a Forced Conversion. Evercore stressed that the Class V stock was "vulnerable following an IPO if the trading value of the Class V Stock during the 10-day look back period is depressed." Compl. ¶ 139 (internal quotation marks omitted).

On March 25, 2018, VMware's bankers told Goldman Sachs that VMware thought the value of the Core Business was $41.5 billion, approximately $8.5 billion less than what the Company claimed. *Id.* ¶ 68. The next day, Goldman Sachs shared VMware's views with Evercore. Ex. 1 at 169.

A week later, after receiving reports on the VMware negotiations, the Special Committee decided to wait and see how those turned out before "consider[ing] the terms of any potential Class V Common Stock transaction." *Id.* at 170. During the same

15

timeframe, the Company's directors received a quarterly valuation prepared by Deloitte & Touche LLP for purposes of transactions involving the Class C stock. The Deloitte valuation implied that the value of the Core Business was $29.3 billion. Compl. ¶ 154; *see* Ex. 1 at 152. The Board approved the valuation as "a good faith determination as to the Fair Market Value of a Share." Compl. ¶ 155 (internal quotation marks omitted).

## F.     The Proposed Redemption

By the end of April 2018, the negotiations with VMware had broken down. The complaint alleges that "the intractable valuation differences" over the values of both the Core Business and VMware "brought the parties to an impasse." *Id.* ¶ 70. Rather than using its control over VMware to engage in a squeeze out, the Company refocused on acquiring the Class V shares, where the existence of the Conversion Right gave the Company relatively greater leverage over the Special Committee and the Class V stockholders.

On April 27, 2018, Goldman Sachs met with Evercore and proposed that the Company redeem the Class V stock in exchange for shares of Class C stock. *Id.* ¶ 140; *see* Ex. 1 at 154; Ex. 16. Goldman Sachs explained that two economic points would have to be resolved: (i) the value of the Core Business (*i.e.*, the value of the Company excluding the Class V Assets) and (ii) the value per share of the Class V stock. Ex. 1 at 154. Goldman Sachs proposed valuing the Core Business at $50 billion, the same valuation that VMware had rejected. Goldman Sachs proposed valuing each share of Class V stock at $100 per share, reflecting a premium of 36.8% over its closing price on April 23, 2018. Using an exchange ratio based on these valuations, the Company would issue 1.2134 shares of Class

16

C stock for each Class V share, resulting in the former holders of Class V stock owning 28.5% of the Company after the redemption.

Evercore reported to the Special Committee on the Company's proposal and noted that the structure was effectively the same as a Forced Conversion. Evercore argued that the negotiated redemption was superior because if the Company exercised the Conversion Right, then it "could force conversion to minimize the value to [Class V] shareholders, without Committee or [Class V] shareholder approval." Compl. ¶ 140 (internal quotation marks and emphasis omitted).

The Special Committee did not provide a formal response to the Company's proposal. Three weeks later, on May 17, 2018, the Company filed a Form 8-K with the SEC in which it disclosed that it was considering a range of strategic options including an initial public offering of the Class C stock. The Company disclosed the existence of the Special Committee and explained that any Potential Class V Transaction other than a Forced Conversion was conditioned on the approval of both the Special Committee and holders of a majority of the outstanding shares of Class V stock. Ex. 1 at 174. After the filing of the Form 8-K, Evercore spoke with more than twenty of the largest holders of Class V stock, representing nearly 40% of the outstanding shares. *Id.*

On May 22, 2018, five days after the Company's filing of the Form 8-K, Goldman Sachs provided Evercore with three alternatives. All were based on the $50 billion valuation of the Core Business. The first option was identical to the April 27 proposal, effectively offering a conversion of the Class V stock into Class C stock at a value of $100 per Class V share. The second option offered holders of Class V stock a choice between (i)

17

shares of Class C stock valued at $100 per share and (ii) cash equal to a 25% premium over the 30-day average closing price of the Class V stock (presented as $90 in cash), with the total cash portion capped at $3 billion and the balance of the consideration provided in shares of Class C stock. The third option offered holders of Class V stock a choice between (i) shares of Class C stock valued at $107.50 per share and (ii) cash equal to a 20% premium over the 30-day average closing price of the Class V stock (presented as $85 in cash), again with the total cash portion capped at $3 billion and the balance of the consideration provided in shares of Class C stock. *Id.* at 175; *see* Compl. ¶ 141. The Company also provided the Special Committee with unaudited financial projections. Compl. ¶ 204.

On May 24, 2018, Goldman Sachs told Evercore that the Company believed that an initial public offering of Class C stock could result in an equity valuation of $50 billion for the Core Business. Goldman Sachs discussed how the Company might proceed with a public offering. Ex. 1 at 175. To reiterate, a public offering of Class C stock was the first step towards a Forced Conversion.

On May 29, 2018, Evercore gave the Special Committee a presentation on the Company's three proposals. Evercore also described its meetings with large Class V stockholders, reporting that "each stockholder expressed the view that a standalone IPO of the Company would be the worst alternative for the Class V Stockholders given the uncertainty of when the Company would convert the Class V Stock . . . to shares of the Company's Class C common stock." Compl. ¶ 142 (internal quotation marks omitted). The Special Committee decided to find an "outside industry consultant to assist in analyzing the assumptions and analyses underlying the revised financial projections." Ex. 1 at 176.

18

On June 1, 2018, Evercore reported to the Special Committee that Goldman Sachs had "requested specific feedback" on its proposals "in advance of the Company's upcoming earnings call scheduled for June 4, 2018." Compl. ¶ 144 (internal quotation marks omitted). Goldman Sachs "indicated that the Committee's feedback . . . could influence the Company's presentation for the earnings call with respect to, among other things, whether the Company intended to pursue a possible IPO." *Id.* (internal quotation marks omitted). The Special Committee declined to provide a specific response. *See id.*; Ex. 1 at 176.

## G.     The Committee-Sponsored Redemption

On June 4, 2018, the Special Committee retained DISCERN Analytics, Inc. to evaluate the Company's revised projections. *See* Ex. 1 at 177. Francis, the lead Evercore banker, recommended DISCERN, which was effectively a one-man shop run by Harry Blount, one of Francis's former colleagues and friends. DISCERN was the latest iteration in a series of Blount entities that had run into financial difficulties; one had been evicted in 2017 for not paying rent, and another owed back taxes to the State of Delaware as of 2018. Compl. ¶ 205. DISCERN had never consulted for a public company. *Id.* ¶ 207.

On June 15, 2018, DISCERN advised the Special Committee that the Company's projections were "reasonable and/or Achievable." *Id.* ¶ 209 (internal quotation marks

omitted). Evercore gave a presentation that again warned of the threat of a Forced Conversion.[3]

The Special Committee decided to make a counteroffer. It valued the Core Business at $42.5 billion and gave holders of Class V stock a choice between (i) shares of Class C stock valued at $115 per share and (ii) $115 in cash, with the total cash portion capped at $9 billion and the balance of the consideration provided in shares of Class C stock. *Id.* ¶ 146. If all of the holders of Class V stock elected to receive cash, then proration would result in the former holders of Class V stock owning 24.7% of the post-transaction entity. If none of the holders of Class V stock elected to receive cash, then the former holders of Class V stock would own 35% of the post-transaction entity.

On June 21, 2018, Goldman Sachs countered with an offer again premised on a $50 billion valuation of the Core Business. Under the Company's proposal, holders of Class V stock could choose between (i) shares of Class C stock valued at $105 per share and (ii) $105 in cash, with the total amount of cash capped at $9 billion. *Id.* ¶ 147; *see* Ex. 1 at 178. If all of the holders of Class V stock elected to receive cash, then proration would result in the former holders of Class V stock owning 19.3% of the post-transaction entity. If none

---

[3] *See id.* ¶ 145 (Evercore explaining "that the Company and its advisors believed a potential IPO is a viable alternative to a negotiated conversion of the Class V Stock, and that certain Class V Stockholders had generally expressed to Evercore in their discussions that an IPO followed by a conversion was likely the least attractive option for the Class V Stockholders" (internal quotation marks omitted)); *id.* (Evercore explaining that in its calls with over twenty Class V stockholders, each "almost universally described a [Dell] IPO as the worst potential outcome for [Class V Stockholders] given the lack of control or approval rights in such a scenario" (internal quotation marks omitted)).

of the holders of Class V stock elected to receive cash, then the former holders of Class V stock would own 29.5% of the post-transaction entity. In connection with this offer, Durban met with Dorman to "stress[] the downsides of a Forced Conversion for Class V stockholders." Compl. ¶ 147. Later that day, Dorman met with Green and the Special Committee's advisors to discuss the benefits of the offer when compared with the threat of a Forced Conversion.

On June 26, 2018, the Special Committee countered with an offer premised on a $46 billion valuation of the Core Business. Holders of Class V stock could choose between (i) shares of Class C stock valued at $112.50 per share and (ii) $112.50 in cash, with the total amount of cash capped at $9 billion. *See* Ex. 1 at 179. If all of the holders of Class V stock elected to receive cash, then proration would result in the former holders of Class V stock owning 23% of the post-transaction entity. If none of the holders of Class V stock elected to receive cash, then the former holders of Class V stock would own 33.3% of the post-transaction entity.

After an additional exchange of proposals, Goldman Sachs presented a final offer premised on a $48.4 billion valuation of the Core Business. Holders of Class V stock could choose between (i) shares of Class C stock valued at $109 per share and (ii) $109 in cash, with the total amount of cash capped at $9 billion. *See id.* at 179–80. If all of the holders of Class V stock elected to receive cash, then proration would result in the former holders of Class V stock owning 20.8% of the post-transaction entity. If none of the holders of Class V stock elected to receive cash, then the former holders of Class V stock would own 31% of the post-transaction entity.

21

The Special Committee tried for a slight increase. In response, the Company claimed that it had made its best and final offer. The Special Committee credited the Company's assertion and accepted its terms. *Id.* This decision has referred to this version of the transaction as the Committee-Sponsored Redemption.

## H.    Stockholder Opposition

On July 2, 2018, the Company announced the terms of the Committee-Sponsored Redemption. That same day, VMware's publicly traded stock closed at $162.02 per share. The difference between that price and the agreed-upon consideration of $109 per Class V share implied that the Company would receive a windfall of $10 billion if the Committee-Sponsored Redemption closed. Compl. ¶ 150.

Large holders of Class V stock immediately objected to the Committee-Sponsored Redemption. An article in *The Wall Street Journal* reported that the Class V stockholders were "disappointed with the terms of the deal . . . and may oppose it." *Id.* ¶ 158 (internal quotation marks omitted). On July 10, 2018, Evercore told the Special Committee that "significant Class V Stockholders would ask for more value." *Id.* ¶ 177 (internal quotation marks omitted). The Special Committee took no action. On July 24, Durban met with a large holder of Class V stock who expressed concerns over price. *See* Ex. 25 at S-56.

On September 23, 2018, *The Wall Street Journal* reported that the Company was interviewing investment banks to advise on a potential IPO in lieu of the Committee-Sponsored Redemption. Compl. ¶ 166. Four days later, the full Board met at Mr. Dell's home to consider the Class V stockholders' dissatisfaction with the Committee-Sponsored Redemption and discuss an "IPO Alternative." *Id.* ¶ 168 (internal quotation marks omitted).

22

Goldman Sachs reported that the Class V stockholders objected to the Committee-Sponsored Redemption because it "(i) undervalues Class V stock; (ii) represents value transfer from Class V Stockholders to Dell's controlling shareholders; (iii) is opportunistic – takes advantage of discount; (iv) overvalues core Dell; and (v) ignores the conglomerate discount that should have attached to a valuation of Dell." *Id.* ¶ 160 (internal quotation marks and alterations omitted); *see id.* ¶ 168. Goldman Sachs also reported that Class V stockholders believed that the Company "has gotten the best of public equity holders historically," and that "Dell can't be trusted" in light of "how the tracker performed." *Id.* ¶ 160 (internal quotation marks omitted). Goldman Sachs reported on discussions with fourteen "Key Investors." *Id.* ¶ 161 (internal quotation marks and alterations omitted). Twelve were "negative" or "leaned negative." *Id.* (internal quotation marks and alterations omitted). One was "neutral." *Id.* (internal quotation marks omitted). Only one viewed the deal positively, and that investor had "yet to review the valuation." *Id.* (internal quotation marks and alterations omitted). Goldman Sachs projected four possible outcomes for the Class V stockholder vote. Only one led to approval and only by a 50.03% majority.

Dorman and Green attended the meeting at Mr. Dell's home. *Id.* ¶ 178. They did not advocate on behalf of the Class V stockholders. They viewed themselves as having no "remaining leverage" because they had "already approved the transaction." *Id.* ¶ 164 (internal quotation marks and emphasis omitted).

After the meeting, Mr. Dell, Durban, and their advisors continued to meet with select Class V stockholders. *Id.* ¶ 170. On October 3, 2018, the Company reported in an SEC filing that "as a potential contingency plan in the event that the [Class V] Exchange

is not consummated, [the Company] had met with certain investment banks to explore a potential initial public offering of its Class C Common Stock." *Id.* ¶ 166 (internal quotation marks omitted).

On October 15, 2018, Carl Icahn wrote an open letter to the Class V stockholders criticizing the Committee-Sponsored Redemption. He reported that Goldman Sachs had "been telling stockholders that" if the Company engaged in a Forced Conversion, "'the IPO could be for a small number of shares and who knows how that will trade.'" *Id.* ¶ 172 (internal quotation marks omitted). Later that day, the Special Committee discussed Icahn's letter and possible further steps, but took no action. *Id.* ¶ 179.

## I.     The Stockholder Volunteers

On October 27, 2018, the Special Committee learned from its advisors that the Company was "considering increasing the aggregate cash component [from $9 billion] to $14 billion." *Id.* ¶ 180 (internal quotation marks omitted). The Special Committee discussed whether to engage in additional negotiations but took no action. *Id.* Five days later, Latham told the Special Committee that the Company appeared to be open to further negotiations, but again the Special Committee took no action. *Id.* ¶ 181.

On November 6, 2018, Evercore reported to the Special Committee that the Company had entered into "non-disclosure agreements with certain significant Class V Stockholders to allow the Company and its advisors to hold confidential discussions with such Class V Stockholders regarding potential improvements . . . to the proposed conversion." *Id.* ¶ 182 (internal quotation marks omitted). These were the Stockholder

24

Volunteers who stepped into the vacuum left by the Special Committee. After receiving this news, the Special Committee took no action. *Id.*

On November 8, 2018, Evercore reported to the Special Committee that "none of the shareholders contacted indicated they will vote for the current proposal" and "the Class V offer price needs to improve for a deal to get done." *Id.* ¶ 183 (internal quotation marks, alterations, and emphasis omitted). After receiving this information, the Special Committee decided to propose that the Company increase the consideration in the Committee-Sponsored Redemption to $125 per Class V share.

The Special Committee called Durban, but the Company ignored its proposal. *Id.* ¶ 184. By that point, the Company had reached an agreement in principle with the Stockholder Volunteers on a transaction at $120 per share. Under what this decision has called the Stockholder-Negotiated Transaction, holders of Class V stock could choose between (i) shares of Class C stock valued at $120 per share and (ii) $120 in cash, with the total amount of cash capped at $14 billion. *Id.* ¶ 186. The value of the Class C stock remained premised on a $48.4 billion valuation of the Core Business. If all of the holders of Class V stock elected to receive cash, then proration would result in the former holders of Class V stock owning 17% of the post-transaction entity. If none of the holders of Class V stock elected to receive cash, then the former holders of Class V stock would own 33.1% of the post-transaction entity. Under the terms of the Stockholder-Negotiated Transaction, the holders of the Class C shares would have the right to elect a member of the Board.

Certain stockholders remained concerned that the value of the Class V stock could decline during the period leading up to the stockholder vote, resulting in the Class V

25

stockholders receiving a less valuable package of consideration. To address this issue, the Stockholder Volunteers and the Company agreed to a floating exchange ratio that would increase the number of Class C shares issued in the transaction to the extent that the price of the Class V stock increased during a seventeen-day window leading up to the stockholder vote. *See* Ex. 25 at S-65 to S-66. If the trading price of the Class V shares increased, then that would imply a lower value for the Company's Core Business and, in turn, a lower value per Class C share. Depending on the performance of the Class V shares, the floating exchange ratio would imply a value of the Core Business of $40 billion to $48.4 billion. *See* Ex. 33 at '315. Stockholder Volunteers holding 17% of the Class V stock executed voting agreements binding them to support the Stockholder-Negotiated Redemption.

On November 14, 2018, the Company informed the Special Committee about the Stockholder-Negotiated Redemption. At 10:00 p.m., the Special Committee met for one hour and approved it. *See* Ex. 33. The Board gave its approval one minute later. Compl. ¶ 190.

On December 11, 2018, holders of 61% of the outstanding shares of Class V stock voted in favor of the Stockholder-Negotiated Redemption. On December 28, 2018, the Stockholder-Negotiated Redemption closed. Based on the trading price of the Class V stock during the measurement period, the floating exchange ratio resulted in the issuance of 1.8066 shares of Class C stock per Class V share, just below the maximum. The resulting transaction implied an equity value for the Core Business of approximately $40.5 billion. That was $9.5 billion less than the valuation that Durban and Goldman Sachs placed on the

Core Business during their negotiations with the Special Committee. It was $11.2 billion more than Deloitte's valuation of the Core Business from eight months earlier.

## J.     This Litigation

On November 8, 2018, one of the plaintiffs filed this action. After a leadership dispute, the lead plaintiff filed the currently operative complaint. It asserts two counts. Count I contends that Mr. Dell, Durban, Patterson, Dorman, Green, and Kullman breached their fiduciary duties as directors when pursuing and approving the Stockholder-Negotiated Redemption. Count II contends that Mr. Dell and Silver Lake breached their fiduciary duties as controlling stockholders when pursuing and causing the Company to enter into the Stockholder-Negotiated Redemption.

## II.     LEGAL ANALYSIS

The defendants moved to dismiss the complaint under Rule 12(b)(6) for failure to state a claim on which relief can be granted. When considering such a motion, a court applying Delaware law (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Id.*

When briefing the motions to dismiss, the defendants attached fifty-six exhibits. Many were materials incorporated by reference in the complaint or public filings with the SEC. Relying on these documents, the defendants in some instances asked this court to

27

draw inferences in their favor, treating the motions to dismiss as if the court could weigh

evidence and make findings of fact. Examples include the following:

- "Prior to engaging Evercore, the [Capital Stock Committee] carefully considered Evercore's qualifications and independence." Dkt. 114 at 18.

- "On February 24, 2018, in connection with [Latham's assessment of Kullman's conflicts] and prior to any discussion of Dell's valuation, Ms. Kullman recused herself from the [Capital Stock Committee] . . . ." *Id.*

- "The Special Committee and its advisors conducted detailed analysis of Dell's value . . . ." *Id.* at 63.

- "Dorman and Green . . . undertook deliberate steps to better understand the significance of Dell's financial performance and operating results." *Id.* at 22.

- DISCERN was "a small consulting firm led by a highly regarded technology analyst with decades of Wall Street experience." *Id.*

- After the announcement of the Committee-Sponsored Redemption, "arbitrageurs flooded into the Class V stock." *Id.* at 24.

- "The Special Committee and Evercore carefully monitored [the negotiations with the Stockholder Volunteers] and conducted their own assessment of Class V stockholder reaction to the [Committee-Sponsored Redemption]." *Id.* at 26.

- The Company had not "made a decision to pursue an IPO if the Class V stockholders voted down the [Stockholder-Negotiated Redemption] or to convert the Class V shares even if an IPO were to occur." Dkt. 119 at 50 (footnote omitted).

The doctrine of incorporation by reference does not enable a court to weigh evidence

on a motion to dismiss, nor does it mean that the defendants receive inferences in their

favor that run contrary to allegations of the complaint. The doctrine permits a court to

review the actual documents to ensure that the plaintiff has not misrepresented their

28

contents and that any inference the plaintiff seeks to have drawn is a reasonable one.[4] The doctrine limits the ability of a plaintiff to take language out of context, because the defendants can point the court to the entire document. The doctrine does not change the pleading standard that governs a motion to dismiss. If there are factual conflicts in the documents or the circumstances support competing interpretations, and if the plaintiff has made a well-pled factual allegation, then the allegation will be credited. *See Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896 (Del. 2002). The plaintiff also remains entitled to "all reasonable inferences." *Id.* at 897. Consequently, if a document supports more than one possible inference, and if the inference that the plaintiff seeks is reasonable, then the plaintiff receives the inference. *Id.*

## A.     The Applicable Standard Of Review

The main issue for purposes of the motions to dismiss is the applicable standard of review. The defendants argue that they properly implemented the framework outlined in *MFW*. If they did, then a version of the business judgment rule applies under which the only remaining claim is one for waste. *See In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. Oct. 10, 2016), *aff'd*, 164 A.3d 56 (Del. 2017) (TABLE). The waste exception is more theoretical than real, because to state a claim for waste, the terms of the transaction must be so extreme "that no rational person acting in

---

[4] *See In re Gen. Motors* (*Hughes*) *S'holder Litig.*, 897 A.2d 162, 169–70 (Del. 2006); *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 (Del. 1995); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 & n.17 (Del. Ch. Feb. 21, 2014).

good faith could have thought the [transaction] was fair to the minority." *In re MFW S'holders Litig.* (*MFW Chancery*), 67 A.3d 496, 500 (Del. Ch. 2013), *aff'd sub nom. MFW*, 88 A.3d at 635. At that point in the analysis, two groups of rational people—the committee and the minority stockholders—would have approved the transaction. It is "logically difficult to conceptualize how a plaintiff can ultimately prove a waste or gift claim in the face of a decision by fully informed, uncoerced, independent stockholders to ratify the transaction." *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999). The resulting version of the business judgment rule is thus rightfully described as "irrebuttable." *Cf. In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 738 (Del. Ch. 2016), *aff'd*, 156 A.3d 697 (Del. 2017) (TABLE).

In this case, the plaintiffs did not attempt to state a claim of waste, so if *MFW* applies, then the motions to dismiss will be granted. If, by contrast, the defendants failed to properly implement the *MFW* framework, then entire fairness becomes the applicable standard of review. The defendants do not contend that the complaint fails to state a claim when judged under that standard, so the motions to dismiss would be denied. At that point, the only remaining question would be whether Kullman, Dorman, or Green are entitled to dismissal because of the exculpatory provision in the certificate of incorporation. *See In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1179 (Del. 2015).

In order to invoke *MFW* and receive the benefit of the irrebuttable business judgment rule, "the controller [must] irrevocably and publicly disable[] itself from using its control to dictate the outcome of the negotiations and the shareholder vote," thereby allowing the conflicted transaction to "acquire[] the shareholder-protective characteristics

30

of third-party, arm's-length mergers." *MFW*, 88 A.3d at 644. The Delaware Supreme Court has articulated six necessary and sufficient conditions for obtaining *MFW* cleansing:

> (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders;
>
> (ii) the Special Committee is independent;
>
> (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively;
>
> (iv) the Special Committee meets its duty of care in negotiating a fair price;
>
> (v) the vote of the minority is informed; and
>
> (vi) there is no coercion of the minority.

*MFW*, 88 A.3d at 645 (formatting altered).

Whether a transaction complies with the *MFW* framework can be adjudicated at the pleading stage. *See In re Synutra Int'l, Inc. S'holder Litig.*, 2018 WL 705702, at *2 (Del. Ch. Feb. 2, 2018), *aff'd sub nom. Flood v. Synutra International, Inc.*, 195 A.3d 754 (Del. 2018). "If a plaintiff . . . can plead a reasonably conceivable set of facts showing that any or all of those enumerated conditions did not exist," the complaint states a claim for relief that entitles the plaintiff to proceed and conduct discovery. *MFW*, 88 A.3d at 645; *accord Olenik v. Lodzinski*, 208 A.3d 704, 715 (Del. 2019).

The plaintiffs assert the defendants failed to comply with all six conditions. Although this decision only needs to conclude that one of the conditions was not met for the motion to be denied, it analyzes four.

31

### 1. Whether The Company Properly Established And Respected The *MFW* Conditions.

The starting point under *MFW* is whether the conflicted transaction was properly conditioned on both a favorable committee recommendation and a properly constituted stockholder vote. Under *MFW*, the irrebuttable business judgment rule governs only if the "controller irrevocably and publicly disables itself from using its control to dictate the outcome of the negotiations . . . ." *MFW*, 88 A.3d at 644. "[W]hat is critical for the application of the business judgment rule is that the controller accept that no transaction goes forward without special committee and disinterested stockholder approval . . . ." *Flood*, 195 A.3d at 756. "*MFW's* dual conditions create 'a potent tool to extract good value for the minority' because from the start of negotiations 'the controlling stockholder knows that it cannot bypass the special committee's ability to say no.'" *Id.* at 762 (quoting *MFW Chancery*, 67 A.3d at 528).

The complaint supports a reasonable inference that the Company did not properly establish and respect the twin-*MFW* conditions. First, the Company excluded a Forced Conversion from the scope of the *MFW* conditions. Second, the Company bypassed the Special Committee by negotiating directly with the Stockholder Volunteers.

#### a. The Exclusion Of The Forced Conversion

The complaint supports a reasonable inference that the Company failed to properly establish the twin-*MFW* conditions at the outset. Mr. Dell and Silver Lake sought to eliminate the Class V tracking stock and consolidate the Company's ownership of VMware. The Company identified three paths to that outcome: (i) a negotiated acquisition

32

of VMware, (ii) a negotiated redemption of the Class V stock; or (iii) a Forced Conversion. The definition of Potential Class V Transaction that framed the Special Committee's mandate only included the first two paths and excluded a Forced Conversion. *See* Compl. ¶ 73; Ex. 9 at '105. By failing to include the exercise of the Conversion Right within the definition of a Potential Class V Transaction and the universe of actions that the Company would not take without satisfying the twin-*MFW* conditions, the Company failed to comply with the requirements of *MFW*. The Company did not empower the Special Committee and the Class V stockholders with the ability to say no.

At the trial level in *MFW*, this court cited the scope of the special committee's mandate in *Kahn v. Lynch Communication Systems, Inc.* (*Lynch I*), 638 A.2d 1110 (Del. 1994), as insufficient to satisfy *MFW*. *See MFW Chancery*, 67 A.3d at 522. In *Lynch I*, Alcatel, S.A. was the controlling stockholder of Lynch Communication Systems, Inc. The management of Lynch had identified an attractive acquisition, but Alcatel vetoed the acquisition and proposed that Lynch merge with an Alcatel affiliate. *Lynch I*, 638 A.2d at 1112. The Lynch board of directors established a special committee to evaluate the proposal, and the committee "expressed its unanimous opposition" to the business combination. *Id.* at 1113. In response, Alcatel proposed to acquire the shares of Lynch common stock that it did not already own at a price of $14 per share. *Id.* The Lynch special committee countered at $17 per share. *Id.* After further back and forth, Alcatel responded with "its final offer of $15.50 per share." *Id.* In considering Alcatel's final offer, the special committee was advised "that Alcatel was 'ready to proceed with an unfriendly tender at a lower price' if the $15.50 per share price was not recommended" and "that the alternatives

33

to a cash-out merger had been investigated but were impracticable." *Id.*; *see id.* at 1119. The committee issued a recommendation in favor of Alcatel's offer at $15.50 per share, and the Lynch board endorsed the offer based on the committee's recommendation. *Id.* at 1113.

A Lynch stockholder challenged the transaction under the entire fairness standard of review. On appeal, the Delaware Supreme Court held that "the ability of the Committee effectively to negotiate at arm's length was compromised by Alcatel's threats to proceed with a hostile tender offer if the $15.50 price was not approved by the Committee and the Lynch board." *Id*. at 1122.

The *Lynch I* decision pre-dated the *MFW* framework by two decades. Nevertheless, at the trial level in *MFW,* this court cited the committee's mandate in *Lynch I* as an example of what would be insufficient for purposes of *MFW*. In the words of this court's decision, the committee in *Lynch I* was never "empowered to say no, because Alcatel reserved the right to and did in fact threaten to approach the stockholders with a tender offer at a lower price." *MFW Chancery*, 67 A.3d at 522.

The Company's reservation of the Conversion Right as a backup to a negotiated redemption closely resembles Alcatel's reservation of a hostile tender offer as a backup to the negotiated merger. As in *Lynch I*, the Special Committee was never fully empowered to say no, because the Company reserved the right to engage in a Forced Conversion and threatened both the Special Committee and the Company's stockholders with that alternative.

34

The defendants offer two responses. First, they argue that a Forced Conversion was an entirely different type of transaction than a negotiated redemption and therefore did not need to come within the twin-*MFW* conditions. It is technically true that the Forced Conversion was a different type of transaction than a negotiated redemption, just as the hostile tender offer in *Lynch I* was technically a different type of transaction than a negotiated merger. What mattered in *Lynch I*, and what matters here, is that they were alternative means of achieving the controller's end. The complaint supports a reasonable inference that a Forced Conversion was one of three routes to the transactional outcome that Mr. Dell and Silver Lake wanted to achieve. That is precisely how Mr. Dell and Silver Lake identified and pursued them. The Company also repeatedly indicated that it would pursue an initial public offering and a Forced Conversion as an alternative to a negotiated redemption.

Second, the defendants argue that the Company was not obligated to foreswear "every hypothetical transaction that may []ever come to pass and would be subject to its own fiduciary analysis." Dkt. 114 at 52–53. That is both true and irrelevant. The Company was required to promise that it would not proceed with any transaction that was functionally equivalent to a Potential Class V Transaction without the support of the Special Committee or the approval of the Class V stockholders. *See MFW*, 88 A.3d at 650. The Company failed to do that.

The complaint thus supports a reasonable inference that the Company failed to give the Special Committee a sufficient mandate to invoke the *MFW* safe harbor. By excluding the Forced Conversion from the scope of the Special Committee's authority, the Company

35

deprived the Special Committee of the full power to say "no" that is necessary for *MFW* to function.

### b. The Direct Negotiations With The Stockholder Volunteers

The complaint also supports a reasonable pleading-stage inference that the Company failed to respect the twin-*MFW* conditions when it bypassed the Special Committee and negotiated directly with the Stockholder Volunteers. *MFW*'s dual protections contemplate that the Special Committee will act as the bargaining agent for the minority stockholders, with the minority stockholders rendering an up-or-down verdict on the committee's work. Those roles are complements, not substitutes. A set of motivated stockholder volunteers cannot take over for the committee and serve both roles.[5]

The *MFW* framework contemplates that the special committee will act as "an independent negotiating agent whose work is subject to stockholder approval." *Flood*, 195

---

[5] This same issue was raised in *In re AmTrust Financial Services, Inc. Shareholder Litigation*, 2020 WL 914563 (Del. Ch. Feb. 26, 2020). There, a controller and special committee reached agreement on a take-private merger. After the deal was announced, a preliminary assessment showed that it would not garner support from a majority of the minority stockholders. In response, the controller negotiated directly with Icahn, who held a significant block of stock. The negotiations resulted in a revised deal which received special committee and board approval. Fifteen days later, a majority of the minority stockholders voted in favor of the revised deal. *See id.* at *6–7. The plaintiffs argued that the negotiations with Icahn disqualified the controller from relying on *MFW* because "Icahn had no access to non-public information about the Company, owed no fiduciary duty to AmTrust's other stockholders, and had his own short-term motivations to bump the price and sell his shares quickly." *Id.* at *9. The court believed that "Plaintiffs' argument seem[ed] to find support in [*Flood*]," but declined to reach the issue because the plaintiffs had "pled sufficient facts to demonstrate that at least one of the [other] conditions of the *MFW* standard ha[d] not been satisfied." *Id.*

A.3d at 767. Through the involvement of the special committee, the *MFW* framework ensures that there are "independent, empowered negotiating agents to bargain for the best price and say no if the agents believe the deal is not advisable for any proper reason . . . ." *MFW*, 88 A.3d at 644 (internal quotation marks and emphasis omitted). Like a board of directors in an arm's-length transaction, the committee has superior access to internal sources of information, can deploy it's the Board's statutory authority under Section 141(a) as delegated to the committee under Section 141(c), and can "act as an expert bargaining agent." *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 618 (Del. Ch. 2005); *see* 8 *Del. C.* § 141(c). Like a board of directors, the committee "does not suffer from the collective action problem of disaggregated stockholders" and is therefore well positioned "to get the last nickel." *Id.* at 619; *see also In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 441 (Del. Ch. 2002) ("Delaware law has seen directors as well-positioned to understand the value of the target company, to compensate for the disaggregated nature of stockholders by acting as a negotiating and auctioning proxy for them, and as a bulwark against structural coercion.").

Under the *MFW* framework, the stockholders have a similarly important yet more limited role. They have "the critical ability to determine for themselves whether to accept any deal that their negotiating agents recommend to them." *MFW*, 88 A.3d at 644 (internal quotation marks omitted). But "the ability of disaggregated stockholders to reject by a binary up or down vote obviously 'unfair' deals does not translate to their ability to do what an effective special committee can do, which is to negotiate effectively and strike a bargain much higher in the range of fairness." *Cox Commc'ns,* 879 A.2d at 619.

37

Within the *MFW* framework, if the committee's initial work is rejected by the stockholders, that does not mean the committee's role is over. Nor does it mean that the committee passes the baton to a handful of stockholder volunteers to negotiate for themselves. Instead, the committee must return to the bargaining table, continue to act in its fiduciary capacity, and seek to extract the best transaction available.

Stockholder volunteers cannot replace the committee. Absent special circumstances, a minority stockholder does not owe fiduciary duties. *See Ivanhoe P'rs v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987) ("Under Delaware law a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation."); *In re Shoe-Town, Inc. S'holders Litig.*, 1990 WL 13475, at *6 (Del. Ch. Feb. 12, 1990) ("[A] minority shareholder does not owe a fiduciary duty for that reason alone . . . ."). A minority stockholder also may have divergent interests in a transaction, whether economic or otherwise.[6] Absent special rights or

---

[6] *See, e.g.*, *Smith v. Fidelity Mgmt. & Research Co.*, 2014 WL 1599935, at *3, *7–8 (Del. Ch. Apr. 16, 2014) (finding after trial that fund managers who settled earlier and at a lower price than plaintiffs' counsel were influenced by the fact that "[t]he investment profile of the [shares] did not match the investment criteria that the fund managers were supposed to follow" and "as long as non-public settlement negotiations were taking place, Fidelity's portfolio managers could not buy or sell Revlon stock"); *In re CNX Gas Corp. S'holders Litig.*, 4 A.3d 397, 417 (Del. Ch. 2010) (finding that an institutional investor "ha[d] materially different incentives than a holder of CNX Gas common stock" because it was "fully hedged" against the pending transaction and "indifferent to the allocation of value between [the buyer] and CNX Gas"); Sean J. Griffith & Dorothy S. Lund, *Conflicted Mutual Fund Voting in Corporate Law*, 99 B.U. L. Rev. 1151, 1172–87 (2019) (describing "serious and recurring conflicts of interests" that can affect voting by fund managers, such as cross ownership and "corporate client" conflicts); Ann M. Lipton, *Shareholder Divorce Court*, 44 J. Corp. L. 297, 307 (2018) (identifying non-shareholder interests that can influence stockholder decision making); Marcel Kahan & Edward B. Rock, *Hedge Funds*

arrangements, a minority stockholder is unlikely to match the committee's ability to access the non-public information necessary to serve as an effective bargaining agent. The committee can receive input from stockholders, but for *MFW* to operate, the committee must continue as the primary negotiator.

The complaint pleads that the Special Committee abandoned the field and stopped acting as the negotiating agent for the Class V stockholders after serving up the Committee-Sponsored Redemption. During the four months that followed, the Special Committee was repeatedly made aware of the Class V stockholders' objections. The Special Committee did not re-engage with the Company. It opted to become a passive instrumentality in a situation where the Board had delegated to the Special Committee the power and duty to protect the best interests of the minority stockholders. In that scenario, the Special Committee was not at liberty to become a passive instrumentality. *See Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985) (explaining that when a board of directors confronted a hostile tender offer, it was obligated to protect the company's stockholders; "Thus, we are satisfied that in the broad context of corporate governance,

---

*in Corporate Governance and Corporate Control*, 155 U. Pa. L. Rev. 1021, 1056 (2007) (citing concern by institutional investors that "voting against management could 'jeopardize the retention of clients of 401(k) and pension accounts'"); Henry T. C. Hu & Bernard Black, *The New Vote Buying: Empty Voting and Hidden (Morphable) Ownership*, 79 S. Cal. L. Rev. 811, 823–46 (2006) (providing examples of how investors can decouple their economic interest from their voting interest, giving them different incentives than other stockholders); Thomas A. Smith, *The Efficient Norm for Corporate Law: A Neotraditional Interpretation of Fiduciary Duty*, 98 Mich. L. Rev. 214, 229 (1999) (explaining how the interests of investors holding only common equity can diverge from "the interests of . . . investors[] who own not only stock but also debt in the firm").

including issues of fundamental corporate change, a board of directors is not a passive instrumentality.").

The defendants argue that the Special Committee remained sufficiently involved in the negotiations through its advisors. In support of this defendant-friendly inference, they cite the multiple instances in which the Special Committee's advisors reported on objections raised by Class V stockholders. *See* Ex. 25 at S-56 to S-57; Ex. 27 at '422; Ex. 30; Ex. 31; Ex. 32. In each case, the Special Committee took no action. The plaintiffs are entitled to the pleading-stage inference that the Special Committee viewed itself as powerless after approving the Committee-Sponsored Redemption and chose to shirk its duties.

Even the Special Committee's lone effort to re-engage supports a reasonable inference that the Company bypassed the duly empowered negotiating agent for the minority. In late October 2018, Latham advised the Special Committee that the Company appeared to be open to renegotiations. Compl. ¶ 181. The Special Committee did not engage. In early November, Evercore reported to the Special Committee that "none of the shareholders contacted indicated they will vote for the current proposal" and "the Class V offer price needs to improve for a deal to get done." *Id.* ¶ 183 (internal quotation marks, alterations, and emphasis omitted). Only then did the Special Committee rouse itself and propose a transaction at $125 per share. The Company ignored the Special Committee, because by that time it had reached an agreement in principle with the Stockholder Volunteers at $120 per share. At that point, the Special Committee imitated a rubber stamp.

Its members spent one hour reviewing the transaction in a late-night meeting and endorsed what the Stockholder Volunteers had accomplished.

The defendants contend that the Company should not be penalized for negotiating with the Stockholder Volunteers. They claim it would be "bad policy" to conclude that "if a controller knew that once it had negotiated with a special committee, it could not further improve the transaction consideration in response to shareholder feedback without foregoing the protection of *MFW* and subjecting itself to an entire fairness review." Dkt. 119 at 33. The Delaware Supreme Court's decisions make clear that a controller should not be able to bypass the committee, which is expected to act as the stockholders' bargaining agent. The Delaware Supreme Court's decisions view this outcome as good policy, not bad policy.

This decision does not hold that a controller loses *MFW* protection when it improves its offer after reaching agreement with the special committee. Instead, this decision holds that to fall within the scope of *MFW*, obtain the protection of the irrebuttable business judgment rule, and receive a pleading-stage dismissal, any improvement must result from continued negotiations with the special committee, not a process that bypasses a now-passive committee in favor of direct negotiations with stockholders. In this case, the Company bypassed the Special Committee by negotiating directly with the Stockholder Volunteers.

The fact that the Company did not respect the twin-*MFW* conditions and bypassed the Special Committee does not mean that arm's-length negotiations with the Stockholder Volunteers will not have any evidentiary benefit. At a later stage of the case, those

41

negotiations will doubtless be part of the evidence that the court must consider when making a unitary determination of fairness, because that inquiry "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983). For present purposes, however, the allegations of the complaint support a reasonable inference that *MFW* does not apply.

### 2. Whether The Special Committee And The Class V Stockholders Were Subject To Coercion.

A second issue under *MFW* is whether either of the two key actors in the *MFW* framework—the special committee and the minority stockholders—were subject to coercion. The complaint supports a reasonable inference that the Company engaged in coercive conduct that undermined the effectiveness of the Special Committee and the legitimacy of the Class V stockholder vote.

#### a. Coercion In Delaware Law

Coercion is a multi-faceted concept in Delaware law. At least five strands of case law use the term, but the different strands involve different factual scenarios and approach the concept of coercion in different ways. Reflexively applying language from a decision issued in one context to a factual scenario implicating a different context, just because the decision uses the term "coercion," can lead to erroneous results.

This decision enumerates the five strands. The first two are not directly relevant to the issues in this case, but it is nevertheless helpful to explain why. The three remaining strands offer guidance for evaluating the question of coercion in this case.

42

###### i. Coercion By A Non-Fiduciary In A Contractual Setting

The first strand of coercion jurisprudence does not involve the conduct of fiduciaries. It rather addresses the ability of a non-fiduciary to offer a reward or impose a penalty as a means of inducing action in an arm's-length setting.

The seminal case is *Katz v. Oak Industries, Inc.*, 508 A.2d 873 (Del. Ch. 1986). The defendant, Oak Industries, Inc., had suffered large losses for three consecutive years. It was also heavily indebted, with six classes of long-term debt outstanding. The company entered into a transaction to sell one of its major lines of business, but consummation of the sale was conditioned on the company amending the indentures governing its debt so that the sale could take place. To obtain the votes necessary to amend the indentures, the company launched tender offers for its debt. Generally speaking, the company offered tendering debtholders a premium over the trading price of the debt but less than its face amount. To accept the offer, a tendering holder had to consent to amending the governing indenture. Any non-tendering holders would be left holding less valuable securities, shorn of significant legal rights. *See id.* at 875–78.

The plaintiffs were bondholders who sought a preliminary injunction blocking the offers. *Id.* at 878. Chancellor Allen denied the motion. After quickly rejecting the plaintiffs' claim that Oak's directors owed them fiduciary duties, he turned to the principal issue in the case: whether the offers violated the implied covenant of good faith and fair dealing because they were structurally coercive.

For purposes of an arm's-length relationship like the contractual setting he faced, Chancellor Allen rejected the idea that "coercion" was inherently wrongful:

43

If, *pro arguendo*, we are to extend the meaning of the word coercion beyond its core meaning—dealing with the utilization of physical force to overcome the will of another—to reach instances in which the claimed coercion arises from an act designed to affect the will of another party by offering inducements to the act sought to be encouraged or by arranging unpleasant consequences for an alternative sought to be discouraged, then—in order to make the term legally meaningful at all—we must acknowledge that some further refinement is essential. Clearly some "coercion" of this kind is legally unproblematic. Parents may "coerce" a child to study with the threat of withholding an allowance; employers may "coerce" regular attendance at work by either docking wages for time absent or by rewarding with a bonus such regular attendance. Other "coercion" so defined clearly would be legally relevant (to encourage regular attendance by corporal punishment, for example). Thus, for purposes of legal analysis, the term "coercion" itself—covering a multitude of situations—is not very meaningful. For the word to have much meaning for purposes of legal analysis, it is necessary in each case that a normative judgment be attached to the concept ("inappropriately coercive" or "wrongfully coercive," etc.). But, it is then readily seen that what is legally relevant is not the conclusory term "coercion" itself but rather the norm that leads to the adverb modifying it.

*Id.* at 879–80.

Turning to the challenged offers, Chancellor Allen assumed for purposes of analysis that Oak had designed them so that any rational bondholder would tender rather than be left behind holding a security stripped of important rights. He nevertheless explained that under principles "derived from the law of contracts," this deal structure was not actionable. *Id.* at 880. There was no specific prohibition in the indentures against inducements to tender, so the only possible protection was provided by the implied covenant. *Id.* at 881. Under that doctrine, the question was whether it was "clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter." *Id.* at 880.

As a general matter, Chancellor Allen rejected an implied term against inducements to tender, "at least where . . . the inducement is offered on the same terms to each holder of an affected security," holding that it would be "wholly inconsistent with the strictly commercial nature of the relationship." *Id.* at 881. He then considered whether two express provisions implied a prohibition. The first prevented Oak from voting bonds held in its treasury, and Chancellor Allen held that it did not imply a prohibition against giving inducing consents. The prohibition on voting treasury securities sought to prevent conflicted voting by Oak itself. The consents in the challenged transaction would be "granted or withheld only by those with a financial interest to maximize the return on their investment in Oak's bonds . . . ." *Id.* The second provision granted Oak a right to redeem the securities at face value, and Chancellor Allen held that this right did not imply a prohibition on tendering for debt at a premium to the market price but a discount to face value. *Id.* at 881–82. In response to the plaintiffs' contention that "the *structure* of the offer 'force[d]' debt holders to tender," Chancellor Allen reasoned that the "exchange offer's success ultimately depends upon the ability and willingness of the issuer to extend an offer that will be a financially attractive alternative to holders." *Id.*

Because *Katz* takes a relatively permissive view of what constitutes coercion and establishes a relatively high bar for a plaintiff to show actionable coercion, defense counsel often cite *Katz* when arguing that a transaction is not coercive. As a result, many decisions

45

involving claims for breach of fiduciary duty cite *Katz*.[7] But *Katz* did not involve

fiduciaries or an alleged breach of fiduciary duty, and it is not an apt source of authority

for the fiduciary relationship.[8] As discussed below, under strands of coercion jurisprudence

involving fiduciaries, transaction structures resembling the offers in *Katz* are treated as

coercive.

Because the *Katz* line of jurisprudence involves action in a non-fiduciary setting, it

is not applicable to this case. It is nevertheless helpful to point that out explicitly, because

---

[7] *See, e.g.*, *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at \*20 nn. 231, 233 (Del. Ch. May 31, 2017); *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at \*14 n. 84, \*15 n. 86 (Del. Ch. Mar. 31, 2017, revised Apr. 11, 2017); *Gradient OC Master, Ltd. v. NBC Universal, Inc.*, 930 A.2d 104, 117 n.39, 119 n.48 (Del. Ch. 2007); *Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at \*13 n.58 (Del. Ch. Oct. 10, 2005); *Lieb v. Clark*, 1987 WL 11903, at \*4 (Del. Ch. June 1, 1987); *cf.* Jonathan T. Wachtel, Comment, *Breaking up Is Hard to Do: A Look at* Brazen v. Bell Atlantic *and the Controversy over Termination Fees in Mergers and Acquisitions*, 65 Brook. L. Rev. 585, 620, 621 n. 231 (1999).

[8] *See Katz*, 508 A.2d at 879 n.7 (recognizing the duties owed under contract law are "quite different from the congeries of duties that are assumed by a fiduciary"). Reinforcing the implications of fiduciary and non-fiduciary frameworks, Chancellor Allen's subsequent decision in *Lacos Land Company v. Arden Group, Inc.*, 517 A.2d 271 (Del. Ch. 1986), distinguished between disclosures that a CEO made about exercising authority in a non-fiduciary stockholder capacity, where a lower standard of coercion analogous to *Katz* might apply, and disclosures made by the CEO about exercising authority in his fiduciary capacity, where a more onerous standard would apply. *See Lacos Land*, 517 A.2d at 277 ("The determination of whether it was inappropriate for [the CEO] to structure the choice of Arden's shareholders (and its directors), as was done here, requires, first, a determination of which of his hats—shareholder, officer or director—[the CEO] was wearing when he stated his position concerning the possible withholding of his 'support' for future transactions unless steps were taken 'to secure his voting position.'").

the *Katz* decision uses the term "coercion" and is often cited as a source of governing principles.

### ii. Coercion By A Non-Fiduciary That Elicits A Fiduciary Response

A second strand of jurisprudence involves a third party taking action that a fiduciary (typically the board of directors) believes could have a coercive effect on the fiduciary's beneficiaries (typically stockholders). In that setting, the fiduciary has both the power and an affirmative duty to defend its beneficiaries from the coercive threat. *See Unocal*, 493 A.2d at 954.

This strand of case law generated what is perhaps the most familiar of coercive structures: the two-tiered, front-loaded offer. Such an offer is structurally coercive because rational stockholders must accept the more attractive consideration offered in the first-step tender offer, lest they be left behind to receive the less attractive consideration provided in the second-step merger. The threat of the unattractive back-end consideration makes it rational to tender in the front end, even if the price offered in the front end might otherwise be inadequate. *Id.* at 955–56.

In the words of the Delaware Supreme Court, "such offers are a classic coercive measure designed to stampede shareholders into tendering at the first tier, even if the price is inadequate, out of fear of what they will receive at the back end of the transaction." *Id.* at 956. Notably, however, that was the same dilemma faced by the bondholders in *Katz*, because if they did not tender their debt and deliver their consents, they could be left

47

holding bonds that had been stripped of their protective provisions. *Katz*, 508 A.2d at 877, 881.

This strand of case law also recognized a second form of coercion, known as substantive coercion, that could be present even in a structurally non-coercive officer, such as an all-cash, all-shares offer. This form of coercion refers to the perceived threat that stockholders might tender "in ignorance or a mistaken belief" about the value of the offer relative to the value of other alternatives available to the company. *Paramount Commc'ns, Inc. v. Time Inc.*, 571 A.2d 1140, 1154 (Del. 1989); *accord Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1384 (Del. 1995). Underlying this theory of coercion was a perception of stockholders as "a diffuse, disaggregated group of [investors] who, although educated and intelligent, [were] financially unsophisticated and lack[ed] the power and motivation to influence corporate governance or policy." Jack B. Jacobs, *Does the New Corporate Shareholder Profile Call for a New Corporate Law Paradigm?*, 18 Fordham J. Corp. & Fin. L. 19, 20 (2012). As a result, stockholders needed their fiduciaries to protect them.

The *Unocal* line of authority permits a fiduciary to respond defensively as long as the fiduciary identifies the threat "in good faith, and after reasonable investigation." 493 A.2d at 949. Under *Unocal*, therefore, it is relatively easy to establish a threat of coercion. This approach, which is the polar opposite of *Katz*, serves the policy goal of empowering fiduciaries to protect beneficiaries who need their aid. The *Katz* framework, by contrast, serves the policy goal of giving arm's-length counterparties a broad domain of action with the expectation that parties engaged in commerce can protect themselves.

Like the *Katz* framework, the *Unocal* precedents on coercion are not pertinent to the current scenario. The issue in the current case is not whether fiduciaries properly identified an external threat of coercion, but rather whether the fiduciaries themselves created a coercive environment that undermined the *MFW* process.

### iii.    Coercion By A Fiduciary

A third strand of coercion jurisprudence examines whether a fiduciary has taken action to coerce its own beneficiaries. By doing so, the fiduciary acts disloyally and violates the standard of conduct expected of fiduciaries. The fiduciary may only avoid a finding of breach by proving that the transaction was nevertheless entirely fair, notwithstanding the fiduciary's use of coercion.

The seminal case in this line of authority is *AC Acquisitions Corp. v. Anderson, Clayton & Co.*, 519 A.2d 103 (Del. Ch. 1986). There, a third party acquirer launched an all-cash, all-shares tender offer for the target company at $56 per share. In response, the target company board of directors caused the company to offer $60 per share in cash for approximately 65% of its stock. *Id.* at 104. The board sought to justify the partial self-tender offer "as the creation of an option to shareholders to permit them to have the benefits of a large, tax-advantaged cash distribution together with a continuing participation in a newly-structured, highly-leveraged Anderson, Clayton." *Id.* at 112. Chancellor Allen accepted that some stockholders, if able to choose freely, might prefer the company's offer, and he agreed that "[t]he creation of such an alternative, with no other justification, serves a valid corporate purpose . . . ." *Id.*

49

Chancellor Allen nevertheless issued a preliminary injunction against the self-tender offer, concluding that it was structurally coercive. He explained that "[i]f all that defendants have done is to create an option for shareholders, then it can hardly be thought to have breached a duty." *Id.* at 113. He further explained that if that option was "so attractive to shareholders as to command their majority approval, that fact alone, while disappointing to [the third party acquirer], can hardly be thought to render the Board's action wrongful." *Id.* But the board's self-tender offer was problematic because no rational stockholder could risk accepting the third-party offer and failing to tender into the company's partial self-tender offer:

> [N]o rational stockholder could afford not to tender into the Company's self-tender offer at least if that transaction is viewed in isolation. The record is uncontradicted that the value of the Company's stock following the effectuation of the Company Transaction will be materially less than $60 per share. . . . What is clear . . . is that a current shareholder who elects not to tender into the self-tender is very likely, upon consummation of the Company Transaction, to experience a substantial loss in market value of his holdings. The only way, within the confines of the Company Transaction, that a shareholder can protect himself from such an immediate financial loss, is to tender into the self-tender so that he receives his *pro rata* share of the cash distribution that will, in part, cause the expected fall in the market price of the Company's stock.

*Id.* at 113–14. The board therefore had not presented stockholders with a choice. It had created a coercive transaction that forced rational stockholders to accept its favored alternative. *Id.*

Notably, this was the same basic structure presented by *Katz*, where holders of the company's debt could not rationally decline to tender lest they be left with securities stripped of important legal protections. In the context of the arm's-length, contractual

relationship in *Katz*, that structure did not give rise to an actionable wrong. In the context of a fiduciary relationship, it suggested a breach of the duty of loyalty.

Chancellor Allen concluded that the business judgment rule would not apply to the partial self-tender offer and that the transaction could only be sustained "if it is objectively or intrinsically fair." *Id.* at 115. Because of the difficulties the defendants would face in proving that the transaction was entirely fair, he issued a preliminary injunction blocking the partial self-tender offer. *Id.*[9]

The *AC Acquisitions* case dealt with fiduciaries who structured a transaction so that the second step would be demonstrably worse for stockholders who did not accept their fiduciaries' chosen alternative. Other cases demonstrate that fiduciaries can coerce stockholders by threatening to make their situation worse.

The leading example is *Lacos Land*, where a board of directors recommended that stockholders approve the creation of a new class of Class B common stock that enjoyed ten votes per share and was entitled to elect 75% of the members of the board of directors, but carried diminished dividend rights and had limited transferability. The company

---

[9] Notably, Chancellor Allen did not enjoin the entire transaction pending trial. He rather suggested that he would issue a targeted injunction, "limited in time and perhaps conditional in nature," that "would strive to remove the coercive aspects of the Company Transaction" by requiring the company to keep the transaction open for a short period, such as thirty days, so that any stockholder who wished could tender into the third-party offer and still be free to participate in the company's self-tender offer if the third-party offer failed to close. *Id.* at 116. That form of relief would not appear to be viable today. *See C & J Energy Servs., Inc. v. City of Miami Gen. Empls.' & Sanitation Empls.' Ret. Tr.*, 107 A.3d 1049, 1071 (Del. 2014).

contemporaneously offered to exchange any shares of the company's Class A common stock for the new Class B shares. *Lacos Land*, 517 A.2d at 273–74. Although nominally available to all stockholders, the new shares were most attractive to the company's CEO, who owned 16.9% of the Class A shares and could increase his voting power to 67.7% of the outstanding by exchanging all of his shares. *Id.* at 274–75.

A holder of Class A common stock sought a preliminary injunction against the recapitalization. The transaction itself was not structurally coercive, because the stockholders theoretically could block it by voting against the charter amendments necessary to create the new Class B shares. Chancellor Allen nevertheless held that the CEO had created a coercive environment by threatening that if the recapitalization was not approved, then he might exercise his powers, including the powers he held as a fiduciary, to thwart corporate transactions that might otherwise be in the Company's best interests. *Id.* at 276, 278–79. As a result of these threats, the "board in recommending the charter amendments and [the] shareholders in approving them were both placed, inappropriately, in a positon that made it significantly less likely than it might otherwise have been that approval of the plan to effectively transfer all shareholder power to [the CEO] would have been given." *Id.* at 276. Other cases illustrate the same general principal, while exploring the distinction between statements that can legitimately be viewed as threats and truthful disclosures about the unattractive consequences of rejecting a transaction.[10]

---

[10] *Compare Eisenberg v. Chi. Milwaukee Corp.*, 537 A.2d 1051, 1062 (Del. Ch. 1987) (holding that inaccurate disclosures rendered a self-tender offer coercive), *with Williams v. Geier*, 671 A.2d 1368, 1383 (Del. 1996) (explaining that a fiduciary is obligated

The operative test for this strand of coercion is whether the fiduciary has taken action which causes stockholders to act—whether by voting or making an investment decision like tendering shares—for some reason other than the merits of the proposed transaction.[11] Under this strand of coercion jurisprudence, if stockholders can reject the transaction and maintain the status quo, then the transaction is not coercive. *See In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 620 (Del. Ch. 1999). The status quo may be undesirable or unpleasant, but that fact does not render the transaction coercive. *See Solomon v. Armstrong*, 747 A.2d 1098, 1131–32 (Del. Ch.), *aff'd*, 746 A.2d 277 (Del. 1999) (TABLE); *Gen. Motors Class H*, 734 A.2d at 621. As in *AC Acquisitions*, "[i]f all that defendants have done is to create an option for shareholders, then it can hardly be thought to have breached a duty." *AC Acqs.*, 519 A.2d at 113.[12]

---

to give truthful disclosures about the negative consequences of a particular course of action, even if they may dissuade stockholders from adopting it), *and Gradient*, 930 A.2d at 120 ("Accurately disclosing circumstances or realities surrounding a [transaction] . . . is not actionably coercive.").

[11] *See Williams*, 671 A.2d at 1382–83 ("Wrongful coercion may exist where the board or some other party takes actions which have the effect of causing the stockholders to vote in favor of the proposed transaction for some reason other than the merits of that transaction."); *Weiss v. Samsonite Corp.*, 741 A.2d 366, 372 (Del. Ch.) ("A tender offer that is 'actionably' or 'wrongfully' coercive is one that . . . induces shareholders who were the victims of inequitable action to tender for reasons unrelated to the economic merits of the offer."), *aff'd*, 746 A.2d 277 (Del. 1999) (TABLE); *see also In re Marriott Hotel Props. II Ltd. P'ship*, 2000 WL 128875, at *18 (Del. Ch. Jan. 24, 2000) (dismissing coercion claim at pleading stage where complaint did not allege a "threatened bad consequence resulting from the conduct of [the defendants] that compelled a decision to tender").

[12] The status quo need not be precisely identical to the stockholders' former position. *See Gradient*, 930 A.2d at 119 ("Keeping the shareholders in the 'same' position . . . does not require an 'identical' position" but only that stockholders are not "forced into 'a choice

This strand of coercion jurisprudence has obvious relevance to *MFW* because, when present, it undermines the reliability of the stockholder vote. A plaintiff who pleads that a controller or other fiduciary has engaged in coercion as framed by this strand of jurisprudence has stated a claim that the requirements of *MFW* were not met.

### iv. Forms Of Coercion Unique To Cleansing Votes

A fourth strand of coercion jurisprudence has developed in response to the powerful cleansing effect of stockholder votes under *Corwin v. KKR Financial Holdings LLC*, 125 A.3d 304 (Del. 2015). Two decisions—*Saba Software* and *Liberty Broadband*—have held that forms of coercion that would not have supported claims for breach of duty were nevertheless sufficient to prevent stockholder votes from having a cleansing effect and changing the standard of review to the irrebuttable business judgment rule. The *Saba Software* decision described the form of coercion that it confronted as "situational coercion." *See Saba Software*, 2017 WL 1201108, at \*16. The *Liberty Broadband* decision identified a different form of coercion, which it labeled "structural coercion." *See Liberty*

---

between a new position and a compromised position' for reasons other than those related to the economic merits of the decision." (quoting *Gen. Motors Class H*, 734 A.2d at 621)). The corporation's condition may be deteriorating, or it may be necessary for a corporation to expend funds or make agreements to secure a favorable option for the stockholders. The obligation to pay a reasonable termination fee in a merger agreement, for example, may mean that stockholders cannot freely reject a deal and return precisely to the pre-deal status quo, but agreeing to pay that fee (and making the other investments in transaction-related expenses) may be necessary to generate the favorable option. *See, e.g.*, *In re Family Dollar Stores, Inc. S'holder Litig.*, 2014 WL 7246436, at \*8, \*11 n.80 (Del. Ch. Dec. 19, 2014); *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 656–57 (Del. Ch. 2008); *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 997, 1014–22 (Del. Ch. 2005); *H.F. Ahmanson & Co. v. Great W. Fin. Corp.*, 1997 WL 305824, at \*8 (Del. Ch. June 3, 1997).

*Broadband*, 2017 WL 2352152, at *2. Their logic applies equally to majority-of-the-minority votes under *MFW*.

### (a)     *Saba Software* And Situational Coercion

The *Saba Software* decision involved the sale of a struggling software company. From 2007 until 2011, executives at the company engaged in fraud that inflated its earnings. After the fraud was uncovered, the company informed investors that it would restate its financial statements, but it failed to make meaningful progress towards that goal. In April 2013, NASDAQ suspended trading in the company's shares, and in June 2013, NASDAQ delisted the company's shares. In September 2014, the company announced a settlement with the SEC in which it agreed to pay a civil penalty of $1.75 million and to complete a restatement of its financials by February 2015. If the company did not meet this deadline, its shares would be deregistered and become illiquid. *Saba Software*, 2017 WL 1201108, at *3.

In the days after the settlement with the SEC, the company's stock traded around $14 per share. Then, in December 2014, the company announced that it would not be able to meet the February 2015 deadline. In the same press release, the company announced that it was exploring strategic alternatives and had engaged in preliminary discussions with potential acquirers. *Id.* In response to these announcements, the company's stock price fell from $13.49 to $8.75 per share. *Id.*

As the deadline for the restatement approached, the company received an expression of interest from Vector Capital, a private equity firm. Vector was one of the company's principal lenders, and Vector also had a relationship with the financial advisor that was

55

advising the company. Vector offered $9 per share, below the company's then-current trading price of approximately $9.45 per share. *Id.* at *5. The board entered into exclusive negotiations with Vector, authorized management to discuss post-transaction employment with Vector, and granted themselves and management equity awards that would vest and be cashed out in the transaction. *Id.* at *6. On February 10, 2015, the board approved a sale to Vector at $9 per share, and the company's two senior officers entered into employment agreements with the acquirer. *Id.* Five days letter, the company missed the deadline for restating its financials, and on February 19, 2015, the SEC deregistered the company's shares. *Id.*

A majority of the outstanding stockholders cast their votes in favor of the sale. *Id.* at *6. After closing, a former stockholder filed suit contending that the company's directors breached their fiduciary duties when pursuing and approving the merger. The defendants moved to dismiss the complaint, arguing that the irrebuttable version of the business judgment rule applied under *Corwin* because a majority of the company's disinterested stockholders had approved the transaction. *Id.* at *7.

The court refused to apply the irrebuttable business judgment rule for several independent reasons. For present purposes, the key rationale was the court's recognition of the concept of situational coercion, under which a status quo can be sufficiently unattractive to prevent a stockholder vote from operating as a clear endorsement of a transaction and therefore having cleansing effect.

In recognizing this concept, the court explained that the essence of the coercion inquiry "focuses on whether the stockholders have been permitted to exercise their

franchise free of undue external pressure created by the fiduciary that distracts them from the merits of the decision under consideration." *Id.* at *15. When voting on a transaction, a vote is uncoerced if stockholders have "a 'free choice between maintaining their current status [or] taking advantage of the new status offered by' the proposed deal." *Id.* (quoting *Gen. Motors Class H*, 734 A.2d at 621). The court explained that because of the company's deteriorating situation, the stockholders were not given a free choice. Instead, they were "given a choice between keeping their recently-deregistered, illiquid stock or accepting the Merger price of $9 per share, consideration that was depressed by the [c]ompany's nearly contemporaneous failure once again to complete the restatement of its financials." *Id.*

The defendants argued that for coercion to exist, a plaintiff had to point to something specific to the vote or the underlying transaction that would prevent stockholders from choosing freely between the alternative being presented and the status quo, such as a two-tiered structure or a retributive threat. Acknowledging that these features were not present, the court explained that "it was not the Proxy's words or even its tone that created the coercion; the inequitable coercion flowed from the situation in which the Board placed its stockholders as a consequence of its allegedly wrongful action and inaction." *Id.* at *16. The court found that it was reasonably conceivable that the stockholder vote was coerced because the stockholders were "forced . . . to choose between a no-premium sale or holding potentially worthless stock" and left "staring into a black box as they attempted to ascertain Saba's future prospects as a standalone company." *Id.* at *15, *16. The court held that "[u]nder these circumstances, . . . the Plaintiff has well-pled that, at the time of the stockholder vote, 'situationally coercive factors' may have wrongfully induced the Saba

57

stockholders to vote in favor of the Merger for reasons other than the economic merits of the transaction." *Id.* at *16 (quoting *Brazen v. Bell Atl. Corp.*, 695 A.2d 43, 50 (Del. 1997)).

The arguably innovative step taken by the *Saba Software* court was to recognize that when determining whether a stockholder vote should have a cleansing effect and result in the application of the irrebuttable business judgment rule, the court must have confidence that the vote reflects an endorsement of the merits of the transaction, not just a preference for a marginally better alternative over an already bad situation. The resulting inquiry differs from the question of whether fiduciaries have acted disloyally by making coercive threats or creating a coercive, two-tiered structure. The situational backdrop of an unacceptable status quo does not give rise to a fiduciary breach, but it calls into question the meaning of a stockholder vote such that it should not be given cleansing effect.

### (b) *Liberty Broadband* And Structural Coercion

This court reached a similar conclusion in *Liberty Broadband*. There, the board of directors of Charter Communications, Inc. presented stockholders with a complex transaction having four component parts: (i) a merger between Charter and Time Warner Cable; (ii) an acquisition of Bright House Networks; (iii) an amendment to a stockholders agreement that would allow Liberty Broadband Corporation, Charter's largest stockholder, to control up to 25% of Charter's outstanding voting power; and (iv) an agreement under which Liberty Broadband would achieve that level of voting power by purchasing $5 million newly issued shares of Charter common stock. *Liberty Broadband*, 2017 WL 2352152, *12–13. The first two components were indisputably beneficial to Charter and its stockholders. The second two components conferred unique benefits on Liberty

Broadband, Charter's largest stockholder. *Id.* The votes on the four components were cross conditioned so that the beneficial merger and acquisition would not take place unless stockholders also approved the two components that favored Liberty Broadband. The transactions were approved by holders of 86% of Charter's outstanding shares, excluding shares held by Liberty Broadband and its affiliates. *Id.* at *13.

A stockholder filed suit contending that the members of Charter's board of directors breached their fiduciary duties by entering into interested and unfair transactions with Liberty Broadband. *Id.* at *14. The defendants moved to dismiss the complaint, arguing that the irrebuttable version of the business judgment rule applied under either *MFW* or *Corwin*. *Id.* at *14–15. The court held that Liberty Broadband was not a controlling stockholder, so it did not analyze the *MFW* issues.

As in *Saba Software*, the *Liberty Broadband* court refused to give cleansing effect to the stockholder vote. *Id.* at *15. Making express a concept implicit in *Saba Software*, the *Liberty Broadband* court explained that Delaware law gives cleansing effect to stockholder votes because "where holders of a majority of stock vote to evince their determination that the transaction is in [the] corporate best interest, there is little utility in a judicial second-guessing of that determination by the owners of the entity." *Id.*; *accord id.* at *2 ("[A] dismissal based on ratification represents a determination by the Court that the stockholders have found the challenged transaction to be in the corporate interest."). The doctrine therefore "depends on the Court's ability to find that the stockholder vote represented an informed determination that the challenged transaction was in the corporate interest." *Id.* at *15; *accord id.* at *2 ("If the vote was structured in such a way that the vote

59

may reasonably be seen as driven by matters extraneous to the merits of the transaction, the Court cannot determine that the stockholders demonstrated thereby a determination that the challenged transaction was in the corporate interest" and "no cleansing by ratification obtains.").

Noting that cleansing effect will not be attributed to a vote that is either uninformed or coerced, the court explained that both exceptions involve situations where the court cannot infer that the stockholders made the necessary determination:

> The Court cannot assume from an uninformed vote that stockholders determined that the transaction was beneficial, in light of the actual facts; thus, an uniformed vote has no ratification effect. Likewise, a coerced vote offers no assurance that the stockholders have made a determination that the transaction at issue is beneficial, only that, under whatever coercive factors exist, they are better accepting the transaction than the alternative. That is what "coercion" means in this context; that facts extraneous to the challenged transaction may have driven the vote, and not a determination by the stockholders that the transaction was in the corporate interest.

*Id.* at *15 (emphasis omitted).

As in *Saba Software*, the court stressed that this concept of coercion "does not necessarily implicate director wrongdoing in the structuring of a vote . . . ." *Id.* at *20. It is "simply a vote structured so that considerations extraneous to the transaction likely influenced the stockholder-voters, so that [the court] cannot determine that the vote represents a stockholder decision that the challenged transaction is in the corporate interest." *Id.* Under those circumstances, "no ratification has occurred, and any inherent breaches of duty regarding the transaction are uncleansed." *Id.* "In such a case, [the court] must do a traditional analysis of the transaction regardless of the stockholder vote, and

60

determine whether business judgment or entire fairness is the applicable standard of review." *Id.*

Applying these concepts, the court explained that "a single vote to approve several unrelated matters, in theory, could be coercive in this sense, if the Court could not conclude that the vote represented an informed ratification of the challenged transaction on its merits." *Id.* at \*15. Like the court in *Saba Software*, the *Liberty Broadband* court started with the proposition that stockholders should have "the 'free choice between maintaining their current status and taking advantage of the new status offered by' the transaction." *Id.* at \*21 (quoting *Gen. Motors Class H*, 734 A.2d at 621). On the facts presented in *Liberty Broadband*, the court held that the cross-conditioned votes did not satisfy the test. The defendants presented Charter stockholders with two beneficial proposals, but conditioned those beneficial proposals such that "stockholders had to vote for a transaction allegedly transferring wealth from Charter to Liberty Broadband, and approve an alleged concentration of voting power in Liberty Broadband." *Id.* at \*22. In this situation, stockholders could not "'*easily protect themselves at the ballot box by simply voting no.*'" *Id.* (quoting *Corwin*, 125 A.3d at 313). "If they voted one way, they would forgo two lucrative deals. If they voted another way, they would transfer value to an insider . . . ." *Id.*

The court also considered the defendants' argument that the transaction had to be considered as a package deal in which the stockholders received a choice between accepting the transaction on offer, warts and all, or maintaining the status quo. If the plaintiff had been arguing that the defendants engaged in coercion amounting to a breach of fiduciary duty, then the defendants' argument likely would have carried the day. But for

61

purposes of determining whether the stockholder vote had cleansing effect, the court considered whether it was reasonably conceivable that the interested transactions were not an essential part of the overall transaction. Based on the allegations of the complaint, the court found it reasonably conceivable that the components of the transaction that favored Liberty Broadband were not essential:

> [O]ne reasonable inference from the facts pled in the Complaint (although not the only one) is that the Defendants obtained the Acquisitions, and then used the value of those transactions to obtain a favorable vote on extrinsic transactions—the Liberty Share Issuances and the Voting Proxy Agreement, transactions that allegedly transferred wealth and voting power to Liberty Broadband at stockholder expense. If so, this was structurally coercive, and no ratifying cleansing resulted therefrom.

*Id.* at *24. The court therefore could not "assume that the vote of the stockholders with respect to the challenged transaction was an informed ratification of that transaction, because of the way the question upon which they voted [was] constructed." *Id.* at *15.

The *Liberty Broadband* decision thus built on the arguably innovative step taken in *Saba Software* by integrating the concepts of situational and structural coercion into the broader doctrinal landscape of cleansing votes. As a matter of policy, giving cleansing effect to a stockholder vote avoids judicial second guessing where stockholders inferably made a decision that the transaction was in their own best interests. If a plaintiff can identify a reasonably conceivable basis to doubt that the stockholders made that determination, then the vote should not be given cleansing effect. The *Saba Software* decision demonstrates the a sufficiently unattractive status quo can give rise to such an inference, because the favorable stockholder vote only implies that the stockholders regarded the transaction as relatively better than the status quo, not that it was in their best interests. The *Liberty*

62

*Broadband* decision demonstrates that cross-conditioned votes can give rise to such an inference, because the favorable stockholder vote only implies that the transaction as a whole is relatively better than the status quo, not that the challenged aspect of the transaction is in the corporation's best interests. Neither form of coercion would support a claim for fiduciary breach; its effect is limited to raising a sufficient question about the meaning of the stockholder vote to prevent it from having cleansing effect.

Although the *Saba Software* and *Liberty Broadband* cases applied the concepts of situational coercion and structural coercion to cleansing votes under *Corwin*, their reasoning applies equally to the majority-of-the-minority vote under *MFW*. Under this line of authority, situational or structural dynamics that do not rise to the level of a breach of fiduciary duty, but which nevertheless call into question the inference to be drawn from the stockholder vote, will prevent the stockholder vote from triggering the application of the irrebuttable business judgment rule.

### v. Coercion Of A Committee

A final strand of coercion jurisprudence shifts the focus from the stockholder vote to the special committee. As with the stockholder vote, a controller's explicit or implicit threats can prevent a committee from fulfilling its function and having a concomitant effect on the standard of review.[13]

---

[13] *See In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *12 n.38 (Del. Ch. Oct. 2, 2009) (explaining that a controller can undermine the effectiveness of a committee by engaging in "threats, coercion, or fraud"); *see also In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *13, *28 n.15 (Del. Ch. Aug. 27, 2015) (explaining that part of the court's pre-trial "conclusion that triable issues of fact

The leading case again is *Lynch I*, where Lynch's controller (Alcatel) offered to acquire Lynch at $14 per share. *Lynch I*, 638 A.2d at 1113. The Lynch special committee countered at $17 per share. *Id.* After further back and forth over price, Alcatel responded with "its final offer of $15.50 per share." *Id.* In considering Alcatel's final offer, the special committee was advised "that Alcatel was 'ready to proceed with an unfriendly tender at a lower price' if the $15.50 per share price was not recommended" and "that the alternatives to a cash-out merger had been investigated but were impracticable." *Id.*; *see id.* at 1119. With no other option, the committee unanimously recommended and the Lynch board approved the $15.50 per share offer. *Id.* at 1113.

A Lynch stockholder challenged the transaction under the entire fairness standard of review. The trial court concluded that the special committee "was sufficiently well informed . . . and aggressive to simulate an arms-length transaction" and shifted the burden of proof to the plaintiff. *Kahn v. Lynch Commc'n Sys., Inc.* (*Lynch Trial*), 1993 WL 290193, at *5 (Del. Ch. July 9, 1993), *rev'd*, 638 A.2d at 1110. The Delaware Supreme Court disagreed, holding that "the ability of the Committee effectively to negotiate at arm's length was compromised by Alcatel's threats to proceed with a hostile tender offer if the $15.50 price was not approved by the Committee and the Lynch board." *Id*. at 1122. The

existed regarding the Committee's independence" existed was based on the controller's response to the outside directors' decision opposing a controller-proposed transaction where the controller "did everything he could to pressure both of them into changing their views," including leaving "a threatening [voicemail] message" with one director, demanding the resignation of another director, and nullifying certain actions taken by the board).

Delaware Supreme Court reversed the trial court and remanded the matter "for further proceedings . . . , including a redetermination of the entire fairness of the cash-out merger . . . with the burden of proof remaining on Alcatel . . . ." *Id.* at 1122.[14]

### b. Coercion In This Case

It is reasonably conceivable that the Company created a coercive situation by threatening a Forced Conversion. By doing so, the Company both undermined the Special Committee's ability to bargain effectively and the ability of the stockholders to vote down

---

[14] On remand, the trial court found that the transaction was entirely fair despite the coercive threat. *Kahn v. Lynch Commc'n Sys., Inc.*, 1995 WL 301403, at *1 (Del. Ch. Apr. 17, 1995), *aff'd*, 669 A.2d 79 (Del. 1995). When evaluating the fair-process aspect of the unitary entire-fairness inquiry, the trial court observed that "the initiation and timing of the transaction were responsive to Lynch's needs," that the negotiations "were no less fair than if there had been no negotiations at all," that the committee had been adequately advised by its financial and legal advisors, and that "Alcatel satisfied its disclosure violations." *Id.* at *2. When evaluating the fair-price aspect of the unitary entire fairness inquiry, the trial court found that Alcatel's expert was "persuasive," that "the valuation prepared by plaintiffs' expert was flawed," and that the other evidence of value was prepared before "Lynch's management revised the company's financial projections downward." *Id.* Relying on the principle that "'the test for fairness is not a bifurcated one as between fair dealing and price,'" the trial court found that "the absence of certain elements of fair dealing d[id] not mandate a decision that the transaction was not entirely fair." *Id.* at *1 (quoting *Weinberger*, 457 A.2d at 711).

On appeal, the plaintiff challenged the trial court's finding by arguing "that coercion creates liability *per se*." *Kahn v. Lynch Commc'n Sys., Inc.* (*Lynch II*), 669 A.2d 79, 86 (Del. 1995). The Delaware Supreme Court affirmed the trial court's finding, reasoning "that to be actionable, the coercive conduct directed at selling shareholders must be a 'material' influence on the decision to sell," and that "[w]here other economic forces are at work and more likely produced the decision to sell, as the Court of Chancery determined here, the specter of coercion may not be deemed material with respect to the transaction as a whole, and will not prevent a finding of entire fairness." *Id.* (quoting *Ivanhoe*, 535 A.2d at 1343).

65

the deal. The complaint's allegations support a reasonable inference that several recognized forms of coercion were in play, any one of which is sufficient to prevent the twin protections of *MFW* from operating.

The complaint identifies a steady drumbeat of actions by which the Company signaled its intent to exercise the Conversion Right in the absence of a negotiated redemption. For example:

- In January 2018, the Company leaked to *Bloomberg* that it was considering an initial public offering of the Class C stock, which was a prerequisite for exercising the Conversion Right.

- On January 31, 2018, the Board conditioned a Potential Class V Transaction on approval by the Capital Stock Committee and the Class V stockholders, but reserved the right to exercise the Conversion Right unilaterally.

- On February 2, 2017, the Company disclosed that it was considering a range of potential transactions, including an initial public offering of the Class C stock.

- On March 14, 2018, the Board revoked its delegation of authority to the Capital Stock Committee and created the Special Committee. The Board conditioned a Potential Class V Transaction on approval by the Special Committee and the Class V stockholders, but again reserved the right to exercise the Conversion Right unilaterally.

- In May 2018, Goldman Sachs gave the Special Committee three options for a Potential Class V Transaction that were designed to capitalize on "[n]ervous[ness] about the prospect of a [Dell] IPO and the [Class V] tracker exchange." Compl. ¶ 141 (internal quotation marks omitted).

- On June 1, 2018, Goldman Sachs requested a response to their proposals and "indicated that the Committee's feedback . . . could influence the Company's presentation for the earnings call with respect to, among other things, whether the Company intended to pursue a possible IPO." *Id.* ¶ 144 (internal quotation marks omitted).

- In mid-June 2018, Evercore reported "that the Company and its advisors believed a potential IPO is a viable alternative to a negotiated conversion of the Class V Stock." *Id.* ¶ 145 (internal quotation marks omitted).

- On June 21, 2018, Durban met with Dorman to "stress[] the downsides of a Forced Conversion for Class V stockholders." *Id.* ¶ 147. Later that day, Dorman met with Green to discuss the comparative benefits of a negotiated transaction over a Forced Conversion.

- On October 3, 2018, the Company disclosed in an SEC filing that "as a potential contingency plan in the event that the [Class V] Exchange is not consummated, [the Company] had met with certain investment banks to explore a potential initial public offering of its Class C Common Stock." *Id.* ¶ 166 (internal quotation marks omitted); *see* Ex. 29.

- According to an open letter that Icahn addressed to the Class V stockholders on October 15, 2018, Goldman Sachs had "been telling stockholders that . . . 'the IPO could be for a small number of shares and who knows how that will trade.'" Compl. ¶ 172 (internal quotation marks omitted).

The complaint's allegations likewise demonstrate that the Special Committee and its advisors were mindful at all times of the Company's ability to implement a Forced Conversion. For example:

- On March 20, 2018, Evercore told the Special Committee that the Class V stock was "vulnerable following an IPO [of the Class C stock] . . . ." *Id.* ¶ 139 (internal quotation marks omitted).

- When the Special Committee received the Company's first proposal, Evercore reminded the committee that if the Company exercised the Conversion Right "post-IPO, the [Board] . . . could force conversion to minimize the value to [Class V] shareholders, without Committee or [Class V] shareholder approval." *Id.* ¶ 140 (internal quotation marks and emphasis omitted).

- At the end of May 2018, Evercore reported to the Special Committee that sixteen large Class V stockholders "expressed the view that a standalone IPO of the Company would be the worst alternative for the Class V Stockholders given the uncertainty of when the Company would convert the Class V Stock . . . to shares of the Company's Class C common stock." *Id.* ¶ 142 (internal quotation marks omitted).

- On November 8, 2018, Evercore presented the Special Committee with an overview of the feedback from the Class V stockholders, including the stockholders' views on an "IPO Alternative." Ex. 27 at '422.

Under *AC Acquisitions* and its progeny, it is reasonably conceivable that the specter of a Forced Conversion caused the Class V stockholders to approve the Stockholder-Negotiated Redemption for reasons other than the merits of that transaction. The Class V Stockholders knew when voting that if they did not accept the consideration provided by the Stockholder-Negotiated Redemption, then they could be compelled to give up their Class V shares through a Forced Conversion, with all of the uncertainty that such a transaction entailed. This species of coercion states a claim against the defendant fiduciaries that renders ineffective the majority-of-the-minority vote that is essential to the second prong of *MFW*.

Under *Lacos Land* and its progeny, it is reasonably conceivable that the Company's disclosures regarding its potential exercise of the Conversion Right constituted improper threats that resulted in coercion. The Company did not simply make truthful disclosures about a necessary consequence of a failure to approve a transaction. The Company was never obligated to exercise the Conversion Right. Instead, the Company's disclosures signaled to the Class V stockholders that if they rejected a negotiated redemption, then the Company would choose to exercise the Conversion Right. This species of coercion states a claim against the defendant fiduciaries that renders ineffective the majority-of-the-minority vote that is essential to the second prong of *MFW*.

Under *Saba Software*, it is reasonably conceivable that the Class V stockholders faced situational coercion sufficient to deprive the majority-of-the-minority vote of its effectiveness. The allegations of the complaint support a reasonable inference that the Class

68

V stockholders had no prospect of escaping the Dell Discount, which had depressed the value of the Class V shares from the time of their issuance.



Dkt. 114 at 13; *see* Compl. ¶¶ 47, 54. Like the defendant fiduciaries in *Saba Software*, Mr. Dell had created the Dell Discount through his prior acts. By attempting to take advantage of the Dell Discount, the Company presented the Class V stockholders with an impossible choice between an unappealing status quo and an alternative which, although unfair, was better than their existing situation. Unlike with the two prior forms of coercion, the presence of situational coercion does not mean that the defendant fiduciaries engaged in wrongful conduct; it simply means that the stockholder vote does not have cleansing effect.

Finally, it is reasonably conceivable that by reserving the right to bypass the Special Committee and engage in a Forced Conversion, the Company created a coercive environment that undermined the Special Committee's ability to bargain effectively. The Delaware Supreme Court observed in *Lynch I* that the special committee in that case appeared to have accepted the controller's offer not because it was "fair," but because the price was "better for Lynch's stockholders than an unfriendly tender offer at a significantly lower price." 638 A.2d at 1118 (internal quotation marks omitted). Likewise in this case, the complaint's allegations support a reasonable inference that the Special Committee did not agree to the Committee-Sponsored Redemption because it was fair, but because it was better for the Company's stockholders than a Forced Conversion. Because of the situation that the Company created, the Special Committee was deprived of the ability to negotiate a redemption, free of the sword of Damocles that the Conversion Right presented. This defect in turn makes it reasonably conceivable that the defendants cannot satisfy the first prong of *MFW*.

### c. The Defendants' Responses

In response to these arguments, the defendants contend that the Company's threats cannot be viewed as coercive because the Conversion Right is written in the certificate of incorporation. That fact does not distinguish this case from other situations where a controller has been found to have engaged in coercion by threatening to exercise a right it possessed. Most notably, in *Lynch I*, Alcatel had the right to launch a hostile tender offer to acquire the interests held by the minority stockholders. Alcatel possessed that right under the federal securities laws and because shares are personal property and freely alienable by

70

default under Delaware law. *See* 8 *Del C.* §§ 159, 201, 202. Yet the Delaware Supreme Court concluded that "the ability of the Committee effectively to negotiate at arm's length was compromised by Alcatel's threats to proceed with a hostile tender offer . . . ." *Lynch I*, 638 A.2d at 1121.

Doctrinally, the defendants' reliance on the presence of the Conversion Right in the certificate of incorporation fails to distinguish between the two analytical steps in Professor Berle's famous formulation:

> [I]n every case, corporate action must be twice tested: first, by the technical rules having to do with the existence and proper exercise of the power; second, by equitable rules somewhat analogous to those which apply in favor of a *cestui que trust* to the trustee's exercise of wide powers granted to him in the instrument making him a fiduciary.

A. A. Berle, Jr., *Corporate Powers as Powers in Trust*, 44 Harv. L. Rev. 1049, 1049 (1931). Both the Delaware Supreme Court and this court have repeatedly recognized that Delaware follows the twice-tested paradigm.[15]

---

[15] *See, e.g.*, *In re Inv'rs Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1222 (Del. 2017) ("[D]irector action is twice-tested, first for legal authorization, and second by equity." (internal quotation marks omitted)); *Quadrant Structured Prods. Co. v. Vertin*, 2014 WL 5465535, at *3 (Del. Ch. Oct. 28, 2014), *aff'd*, 151 A.3d 447 (Del. 2016 (TABLE); *Sample v. Morgan*, 914 A.2d 647, 672 (Del. Ch. 2007) ("Corporate acts thus must be twice-tested—once by the law and again by equity." (internal quotation marks omitted)); *see also Pure Res.*, 808 A.2d at 434 ("Nothing about [the doctrine of independent legal significance] alters the fundamental rule that inequitable actions in technical conformity with statutory law can be restrained by equity."); *cf. Marino v. Patriot Rail Co.*, 131 A.3d 325, 336 (Del. Ch. 2016) ("Post–1967 decisions by the Delaware Supreme Court . . . rendered untenable the strong-form contention that a statutory grant of authority necessarily foreclosed fiduciary review.").

The fact that the Conversion Right appears in the certificate of incorporation answers the first step in the twice-tested paradigm. It makes clear that the Company had the *power* to engage in a Forced Conversion. But that does not end the analysis. A court must still determine whether the defendant fiduciaries acted equitably. "[I]nequitable action does not become permissible simply because it is legally possible." *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971).

The question raised by this litigation is whether the defendants acted in a manner that complies with the equitable second step of the two-step analysis. The plaintiffs contend that by negotiating a redemption against a backdrop in which the Company reserved the right to exercise the Conversion Right, the defendants acted inequitably and in breach of their fiduciary duties. The fact that the Conversion Right appears in the certificate of incorporation does not obviate the need for equitable analysis.

The defendants also argue that because the Stockholder Volunteers were able to improve on the Committee-Sponsored Redemption, the complaint cannot support a reasonable inference that the stockholders were coerced. The comparison for purposes of a coercion analysis is between the actual result and a hypothetical outcome achieved in an atmosphere free of coercion. In such an environment, the Special Committee might have achieved a superior transaction, or the Stockholder Volunteers might have achieved an even better result. The complaint supports a reasonable inference that the Special Committee was coerced and unable to bargain at arm's length. The Stockholder Volunteers were able to improve on the Special Committee's flawed work, but that does not mean that they too were not coerced. The fact that they did a relatively better job than the Special

72

Committee does not mean that the outcome they achieved was fair. *See Lynch I*, 638 A.2d at 1121 (holding that special committee had been coerced despite the fact that the "[c]ommittee rejected three initial offers").

The defendants finally contend that even if the Stockholder-Negotiated Redemption exploited the Class V stockholders, they could have voted it down and maintained the status quo. To reach that conclusion, this decision would have to draw an inference in the defendants' favor by accepting the defendants' claim that that the Company had not "made a decision to pursue an IPO if the Class V stockholders voted down the [Stockholder-Negotiated Redemption] or to convert the Class V shares even if an IPO were to occur." Dkt. 119 at 50 (footnoted omitted). In support of their contention, the defendants rely on a single citation to a transcript from an analyst call held on September 18, 2018, where the Company's Chief Financial Officer commented,

> We don't need to do the transaction. But we do think that aligning interests would be I think mutually beneficial in the sense of making sure that we align the interest of our all [sic] shareholders under one umbrella of equity . . . .

> And if, . . . the shareholders decide that it's not what they want, then we're going back to status quo and we'll think our way through and we'll continue to run the business.

Ex. 28 at 24.

The inference that the defendants request runs contrary to the allegations of the complaint and the documents incorporated by reference. At the pleading stage, the plaintiffs are entitled to all reasonable inferences. Regardless, even if the Company had not made a final decision on exercising the Conversion Right, what mattered for purposes of coercing the Special Committee and the Class V stockholders was the Company's repeated

73

references to the possibility of exercising the Conversion Right. In *Lynch I*, the Delaware Supreme Court concluded that Alcatel's threat was coercive even though the controller never definitively stated that it would go hostile but only stated that it was "ready to proceed" and "giving serious consideration to making an unfriendly tender." 638 A.2d at 1119 (internal quotation marks omitted). In colloquial terms, someone pointing a gun at you may not have decided whether to pull the trigger, but the situation is objectively threatening regardless of the shooter's subjective intent.

Assuming for the sake of argument that returning to the status quo was an option, the Class V stockholders still faced situational coercion under the analysis in *Saba Software* and *Liberty Broadband*. The status quo for the Class V stockholders meant enduring the Dell Discount, which deprived them of the fair value of their shares. That unappealing situation meant that stockholders had an incentive to vote in favor of an unfair redemption for reasons other than its merits, rendering the stockholder vote ineffective for purposes of *MFW*.

### 3. Whether The Special Committee Was Independent.

A third requirement that must be met before the twin protections of *MFW* can have cleansing effect is for the special committee be independent. *MFW*, 88 A.3d at 645. To plead that a director is not independent "in a manner sufficient to challenge the [*MFW*] framework, a plaintiff must allege facts supporting a reasonable inference that a director is sufficiently loyal to, beholden to, or otherwise influenced by an interested party so as to undermine the director's ability to judge the matter on its merits." *Books-A-Million*, 2016 WL 5874974, at *9.

74

In this case, the Special Committee had two members. If the complaint supports a reasonable inference that either member was not disinterested and independent, then the plaintiffs have called into question this aspect of the *MFW* requirements. *See, e.g.*, *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1046 n.8 (Del. 2004); *Beneville v. York*, 769 A.2d 80, 85–87 (Del. Ch. 2000).

Because the defendants moved to dismiss the complaint under Rule 12(b)(6), the question is whether the plaintiffs have pled facts making it reasonably conceivable that either member of the Special Committee was not independent. The pleading standard that governs under Rule 12(b)(6) is less stringent and more plaintiff friendly than the standard that governs under Rule 23.1, which is the framework in which determinations of disinterestedness and independence are often made.[16] Under Rule 12(b)(6), a plaintiff need not plead facts with particularity. *Malpiede*, 780 A.2d at 1082–83. It is therefore possible that facts which would support a reasonably conceivable inference that a director is interested or lacks independence would not carry the day under Rule 23.1.[17]

---

[16] *Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 39 (Del. 1996) ("Delaware courts have recognized that the standard to be used to evaluate a Chancery Rule 12(b)(6) motion is less stringent than the standard applied when evaluating whether a pre-suit demand has been excused in a stockholder derivative suit filed pursuant to Chancery Rule 23.1."); *accord Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001); *see Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).

[17] *See, e.g.*, *In re BGC P'rs, Inc., Deriv. Litig.*, 2019 WL 4745121, at *15 (Del. Ch. Sept. 30, 2019) (inferring at pleading stage that member of special committee was not independent and observing that "[u]nder the heightened pleading standards of Rule 23.1, [the cited] facts, without more, would not overcome the presumption of independence our law accords to a director of a Delaware corporation," but that "[u]nder the lower pleading standard of Rule 12(b)(6), . . . it is reasonably conceivable that" the director was not

In this case, the complaint contains allegations which support a reasonable inference that neither Special Committee member was independent. This outcome is largely the result of the plaintiff-friendly standard that the court must apply at the current stage of the case.

### a. Dorman

Dorman is one of three partners in Centerview Capital, a role that constitutes his principal employment. Centerview Capital focuses on "late stage venture and growth capital investments in the technology industry." Compl. ¶ 102 (internal quotation marks omitted). Centerview Capital's parent organization Centerview Partners has longstanding relationships with Mr. Dell and Silver Lake, having advised them on their successful leveraged buyout of the Company's predecessor in 2013 and on the Company's acquisition of EMC in 2015.

Like its parent, Centerview Capital benefits from its relationships with Mr. Dell and Silver Lake, and Dorman regularly leverages those relationship to raise capital and attract new investment opportunities. *Id.* For example, Centerview Capital was invited to invest $19.5 million in convertible notes issued by SecureWorks Inc., one of the Company's subsidiaries. In April 2016, SecureWorks conducted an IPO, and Centerview Capital converted its notes into equity. Mr. Dell maintained control, and Dorman joined the

independent (footnote omitted)); *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 256 n.13, 261 n.45 (Del. Ch. 2006) (drawing inference for purposes of motion to dismiss pursuant to Rule 12(b)(6) that "none of Primedia's directors can be considered independent" and observing that "the 'reasonable doubt' standard used in a demand futility analysis provides a higher hurdle for a plaintiff than the relatively lenient standard of review pursuant to Rule 12(b)(6)").

SecureWorks board. Five months later, Dorman joined the Company's Board. Centerview Capital has invested in five other companies associated with Mr. Dell and Silver Lake. *See id.* ¶ 108.

In addition to his business ties to Mr. Dell and Silver Lake, Dorman has close social ties to Durban, the managing partner of Silver Lake. Both men belong to two of the world's most exclusive and secretive private clubs—Augusta National Golf Club and San Francisco Golf Club—each with only approximately 300 members. *Id.* ¶ 92. Membership at August National has been referred to as "a tight-knit cluster of like-minded souls who deeply trust one another," akin to a "college fraternity." *Id.* ¶ 94 (internal quotation marks omitted). With qualities similar to Augusta National, San Francisco Golf Club has been described as "the most difficult club to get into." *Id.* ¶ 95 (internal quotation marks omitted). These are no ordinary golf clubs, and both Dorman and Durban were recently recognized by the former Chairman of Augusta National as being "special" among the "west coast August National members." *Id.* ¶ 93 (internal quotation marks omitted). Dorman and Durban have played together in numerous amateur golf tournaments, and Dorman and Durban are also both "platinum" donors to the University of Georgia, an elite list of individuals who donate over $25,000 per year to the university.

The defendants argue that these relationships are not sufficient to raise a pleading-stage question about Dorman's independence, and they attack them each individually. A complaint's allegations about a lack of independence must be viewed holistically. *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1023 (Del. 2015).

Taken as a whole, it is reasonably conceivable that Dorman's relationship with Mr. Dell and Silver Lake compromised his ability to engage in hard-nosed bargaining as a member of the Special Committee. As a principal of Centerview Capital, Dorman had reason to remain on good terms with both Mr. Dell and Silver Lake, given their outsized influence in the financial world and the history of beneficial transactions that these relationships have generated for Dorman's firm.

Dorman's social connections with Durban underscore and reinforce his financial and economic relationships with Mr. Dell and Silver Lake. The social connections that the complaint identifies, which involve two of the most elite and selective clubs in the world, go beyond simply belonging to the same local country club, suggesting more than a "thin-social circle friendship." *Id.* at 1022; *see id.* (contrasting relationships that raise a reasonable doubt of independence from those that naturally develop among directors which were at issue in *Beam*). For purposes of this case, the social connections are reinforced by the fact that Dorman turned to a third member of both Augusta National and San Francisco Golf Club—Stuart Francis of Evercore—to serve as the lead banker of the Special Committee, and the retention happened only days after Francis played in a golf tournament with Dorman and in a foursome with Durban's wife. Under Rule 12(b)(6), the plaintiffs have raised a reasonable doubt about Dorman's independence.[18]

---

[18] The plaintiffs also cite Dorman's service as the non-executive Chairman of the board of directors of CVS Health Corporation. In fiscal 2018, the Company purchased $41.8 million of products and services from CVS, and CVS purchased $45.6 million in products and services from the Company. These figures fail to support a reasonable

### b. Green

The allegations of the complaint also support a reasonably conceivable inference that Green was not independent. The complaint pleads that Green had a thirty-year friendship and business association with Joseph Tucci, who has described himself as Mr. Dell's "brother from another mother" and is one of Mr. Dell's closest friends. Compl. ¶ 118 (internal quotation marks omitted). Tucci and Mr. Dell's relationship spans decades and includes multiple business partnerships. Tucci acted as the Company's "senior advisor" for purposes of the events that led to the Stockholder-Negotiated Redemption. *Id.* (internal quotation marks omitted).

The allegations about Green's ties to Tucci suggest an important and long-standing relationship. Tucci was the former CEO of EMC, and Green served on EMC's board of directors. Green and Tucci worked closely together to close the Company's acquisition of EMC. After that transaction, Green joined the Company's Board, and Tucci became Mr. Dell's senior advisor. During the same period, Green and Tucci co-founded GTY, where they serve as its co-CEOs. *Id.* ¶ 117. GTY is a blank-check company that focuses on investments in government technology, a field in which Mr. Dell and Silver Lake have significant influence. Green and Tucci have traded on their relationship with Mr. Dell to attract investors. For example, the October 2016 registration statement for GTY's common stock mentioned "Dell," the name of a Company subsidiary, and "VMware" at least

---

inference that either company had a material relationship with the other. This ostensible connection with the Company does not affect the analysis of Dorman's independence.

twenty-seven times. *Id.* ¶ 121. GTY raised $552 million. *Id.* ¶ 120. Green's service as the former chairman of BackOffice Associates also appears to have resulted from a tie to Tucci. Green was appointed to the BackOffice board after Tucci's private equity firm bought a majority stake in the company. *Id.* ¶ 121.

For purposes of the redemption in this case, Green's relationship with Tucci is potentially compromising because Tucci acted as the Company's "senior advisor" for purposes of the events that led to the Stockholder-Negotiated Redemption. *Id.* ¶ 119. Tucci began participating in meetings regarding the redemption in January 2018, including the meeting when the Board empowered the Capital Stock Committee to negotiate on behalf of the Class V stockholders.

The defendants contend that Green's relationship with Tucci is irrelevant because Tucci is not Mr. Dell or Silver Lake. Dkt. 114 at 48. The defendants fail to cite any authority that requires a director to have a compromising relationship with the controller himself as opposed to a close advisor or other associate. Drawing such a distinction makes little sense when the advisor acts as the controller's agent. In this case, Green was supposed to be representing the Class V stockholders as their independent bargaining agent in a transaction where Tucci, his co-CEO and long-time close friend, was advising the Company and Mr. Dell on the other side of the negotiating table.

The defendants also contend that Tucci did not "play[] any role" in the Stockholder-Negotiation Redemption. Dkt. 119 at 19. To support that claim, they cite the proxy statement's discussion of the special committee's meetings. By making this argument, they ask the court to weigh evidence and draw a defendant-friendly inference. The complaint

alleges that Tucci stated in a television interview that he had a "formal role[]" as a "senior advisor" to the Company in connection with the Committee-Sponsored Redemption. Compl. ¶ 119. At the pleading stage, the plaintiffs are entitled to the reasonable inference that Tucci was being honest when making his public declaration, which in turn supports a reasonable inference that he in fact was involved in and had significant influence over the transaction.

As a further basis to question Green's independence, the plaintiffs allege what while serving as a member of the Special Committee, Green also served as a director of Pivotal, one of the Company's subsidiaries and an entity that is commercially dependent on the Company and VMware. *See id.* ¶ 112. In April 2018, the Company took Pivotal public, with Goldman Sachs serving as the lead underwriter. Thus, at the same time Green was negotiating against Goldman Sachs, the investment bank was representing him in his capacity as a Pivotal director. After the IPO, the Company selected Green to continue serving as a director of Pivotal.

Taken as a whole, it is reasonably conceivable for pleading purposes that Green's relationship with Tucci and his role as a Pivotal director compromised his ability to negotiate vigorously and independently against Tucci and the Company as a member of the Special Committee. For pleading-stage purposes, the plaintiffs have raised a reasonable doubt about Green's independence.[19]

---

[19] The plaintiffs also cite Green's status as a director of Inovalon Holdings Inc., a healthcare technology company. The plaintiffs allege that Inovalon is a long-time customer of the Company and that the Company has repeatedly promoted Inovalon's business. *Id.* ¶

## 4. Whether The Stockholder Vote Was Fully Informed.

A fourth requirement that must be met before the twin protections of *MFW* can have cleansing effect is that the stockholder vote on the challenged transaction must have been fully informed. *MFW*, 88 A.3d at 645. Determining whether the stockholder vote was fully informed requires assessing "whether the Company's disclosures apprised stockholders of all material information and did not materially mislead them." *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018). "At the pleading stage, that requires [the court] to consider whether

---

123. Neither allegation supports a reasonable inference that Inovalon is dependent on the Company or that this relationship would be compromising for Green.

As an additional ground for questioning both Dorman and Green's independence, the plaintiffs contend that the directors could not independently represent the interests of the Class V stockholders because they were fiduciaries for the Company. As a result, the plaintiffs contend they faced a structural conflict comparable to that faced by a dual fiduciary, because as bargaining agents for the Class V stockholders, they had an obligation to seek the highest price possible, while as fiduciaries for the Company, they had a duty to help the Company acquire the Class V shares for the lowest price possible. In practical terms, "every additional dollar of cash consideration they achieved for Class V Stockholders in negotiations would represent an additional dollar of debt with which they themselves would have to contend as Dell directors following the [Stockholder-Negotiated Redemption]." Dkt. 117 at 36–37. The same structural conflict does not exist when a special committee represents the company and its minority stockholders in negotiations against a controlling stockholder. In that situation, the directors of the company do not owe fiduciary duties directly to the controlling stockholder, but rather to the stockholders as a whole. *See generally see* J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 Bus. Law. 33, 33–34 (2015) (collecting authorities).

The plaintiffs' argument raises significant policy issues and, if credited, could limit the use of the *MFW* structure to cleanse self-tender offers, redemptions, and other transactions in which the corporation that the committee members serve stands opposite the stockholders whom the committee members have been asked to represent. Because there are other reasons why *MFW* does not apply in this case, this decision does not reach this argument.

82

Plaintiff's complaint, when fairly read, supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading." *Id.*

A fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (internal quotation marks omitted). The test does not require "a substantial likelihood that [the] disclosure . . . would have caused the reasonable investor to change his vote." *Id.* (internal quotation marks omitted). The question is rather whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (internal quotation marks omitted).

The question of materiality is "a context-specific inquiry, and '[t]he myriad of detailed information that must be furnished to shareholders necessarily differs from merger to merger.'" *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *11 (Del. Ch. June 30, 2014) (quoting *Glassman v. Wometco Cable TV, Inc.*, 1989 WL 1160, at *5 (Del. Ch. Jan. 6, 1989)).

"[O]nce defendants travel[] down the road of partial disclosure of the history leading up to the Merger . . . they ha[ve] an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events." *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280 (Del. 1994). "[E]ven a non-material fact can, in some instances, trigger an obligation to disclose additional, otherwise non-material facts in order to prevent

the initial disclosure from materially misleading the stockholders." *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996).

On October 19, 2018, the Company issued a proxy statement that recommended that stockholders accept the Committee-Sponsored Redemption. *See* Ex. 1. On November 26, 2018, the Company filed a supplement that reflected the terms of the Stockholder-Negotiated Redemption. *See* Ex. 25.

The complaint states a claim that the proxy statement and supplement did not contain all material information necessary for the vote by the Class V stockholders to be fully informed. It is reasonably conceivable that three categories of material information were either omitted or presented in a way that was materially misleading.

### a. The Special Committee's Proposal Of $125 Per Share

The first disclosure problem concerns the Special Committee's proposal on November 8, 2018, that the Company engage in a negotiated redemption at $125 per share. The supplement stated:

> The Special Committee determined that it would inform Mr. Durban that the Special Committee believed, based on feedback from the Class V stockholders, that the Company would need to increase the proposed per share price of the Class V Common Stock in order to obtain Class V stockholder approval of the Class V transaction, should increase the cash consideration by the full $5 billion discussed and also should consider enhanced governance terms.

> Also on November 8, 2018, following the Special Committee meeting earlier in the day, the members of the Special Committee discussed the potential revised Class V transaction terms with Mr. Durban and a representative of Goldman Sachs, including, among other things, increasing the per share price of the Class V Common Stock, the potential increase in aggregate cash consideration and the addition to the Company's board of directors of a director separately elected by holders of the Class C Common Stock.

*Id.* at S-60 to S-61.

The supplement did not disclose the price of the Special Committee's proposal. Although a proxy statement need not provide "an account of proposals and counterproposals made by each side in the ebb and flow of negotiations," it is reasonably conceivable that the price of the Special Committee's final proposal was material information. *Repairman's Serv. Corp. v. Nat'l Intergroup, Inc.*, 1985 WL 11540, at *8 (Del. Ch. Mar. 15, 1985).

This court has explained that stockholders should be "informed of the value that the Special Committee placed on [the Company] at a point in the negotiations when it had sufficient financial information to make a serious offer." *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 795 (Del. Ch. 2011), *aff'd sub. nom. Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012). The Special Committee's proposal was the last price that the Special Committee suggested and the only price that the Special Committee identified after the stockholders indicated that they would not approve the Committee-Sponsored Redemption. The Special Committee indisputably made its proposal at a point in the negotiations when it had sufficient financial information to make a serious offer. The value that the Special Committee proposed was $3 billion higher than the Committee-Sponsored Redemption and $1 billion higher than the Stockholder-Negotiated Redemption. The Class V stockholders were entitled to know the price that the Special Committee proposed.

In addition to withholding material information about the Special Committee's proposal, the supplement described the proposal in a misleading way. The supplement

implies that the Special Committee successfully advocated to increase the price of the redemption to $120 per share. The allegations of the complaint support a reasonable inference that this impression was false, because the Company had already reached an agreement in principle with the Stockholder Volunteers on a transaction at $120 per share and ignored the Special Committee. *See* Ex. 25 at S-67 to S-68. It is reasonable to infer that the disclosures regarding this issue failed to provide the Class V stockholders with the material information necessary for the vote to be fully informed.

### b. Information Concerning The Advisors

A second disclosure problem concerns material information about the Special Committee's financial advisors. "Because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, this Court has required full disclosure of investment banker compensation and potential conflicts." *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 832 (Del. Ch. 2011). The logic of that requirement extends to other key advisors that a special committee retains.

The proxy statement and supplement described DISCERN as an "independent industry expert." Ex. 1 at 45; Ex. 25 at S-63. It is reasonably conceivable that this disclosure was materially misleading given DISCERN's lack of experience and murky history. The proxy statement also failed to describe DISCERN's compensation arrangement. The complaint supports a reasonable inference that the omission of DISCERN's compensation arrangement was material, given DISCERN's status as a one-person firm operated by someone whose entities had a history of financial difficulties.

The plaintiffs argue in general terms that the proxy statement fails to provide a fair summary of DISCERN's analysis. "A fair summary does not require disclosure of sufficient data to allow stockholders to perform their own [analysis]," but only "an accurate description of the advisor's methodology and key assumptions." *In re Trulia, Inc. S'holder Litig.*, 129 A.3d 884, 901, 904 (Del. Ch. 2016). The proxy statement describes DISCERN's conclusions, methodologies, and assumptions. *See* Ex. 1 at 177, 224–25. This is sufficient under Delaware law.

The plaintiffs similarly argue that the proxy statement failed to disclose Evercore's ongoing relationship with Silver Lake, which resulted in $8 million in fees over the preceding two years. That disclosure appears in the proxy statement. *See id.* at 190.

The plaintiffs also contend that the proxy statement should have disclosed Evercore's representation of EMC in connection with its acquisition by the Company in 2016 and the fact that Evercore assumed at the time that the Class V stock would trade at a discount of 0–10% to the VMware stock. That piece of information is interesting, but it goes beyond what is material.

The plaintiffs finally contend that the proxy statement failed to disclose that Francis and Dorman played in the AT&T Pebble Beach Pro-Am golf tournament during the weekend of February 7, 2018, and that Francis played in a foursome with Durban's wife. The plaintiffs say that information was material given that the Capital Stock Committee contacted Evercore on February 12, and that three days later, the committee hired Evercore without interviewing any other financial advisors. Details of that type are interesting and

can be pertinent in litigation, but they go beyond what is material to a stockholder making a decision on how to vote.

### c. The Special Committee's Knowledge Of Deloitte's Valuations

The third disclosure issue concerns the fact that the members of the Special Committee knew that in April 2018, Deloitte had valued the Class C shares at between $49.28 per share to $58.59 per share, which implied a value of the Core Business at between $29.3 billion and $35.2 billion. *See* Ex. 54 at '941. The Committee-Sponsored Redemption valued the Core Business at $48.4 billion, which implied a value of $79.87 per Class C share. The Stockholder-Negotiated Redemption valued the Core Business at $40.5 billion, which implied a value of $66.83 per Class C share.

The proxy statement states that Dorman and Green "recused themselves" from the meeting of the Board at which the valuation was reviewed and approved. *See* Ex. 1 at 170. The complaint points to the minutes of the meeting, which state that both Dorman and Green received the Deloitte materials and that Green was present at the meeting, although he recused himself from voting. *See* Ex. 53 at '084.

The complaint supports a reasonable inference that the disclosure about the Deloitte valuation was materially misleading. It is reasonable to infer that a Class V stockholder would have wanted to know that just three months before the Special Committee approved the Committee-Sponsored Redemption, the Special Committee received materials from a reputable advisory firm opining that the Class C stock was worth far less. Eight months passed before the vote on the Stockholder-Negotiated Redemption, but it is reasonably

88

conceivable that the information had not become stale. It remained a material source of valuation information that should have been provided to stockholders.

### d. Other Disclosure Issues

The plaintiffs raise a number of other disclosure issues. None of them rise to the level of materiality. To avoid overburdening an already long decision, this decision does not address them specifically.

### 5. Other Challenges To The *MFW* Structure

In addition to the foregoing challenges, the plaintiffs advance other arguments as to why the defendants failed to properly implement the *MFW* structure. Having addressed the four principal arguments, this decision does not reach the other issues.

## B. Exculpation

The defendants do not dispute that if entire fairness applies, then the complaint states a claim on which relief can be granted. In that eventuality, however, Kullman, Green, and Dorman contend the claims against them should be dismissed because they are entitled to exculpation.

Section 102(b)(7) of the Delaware General Corporation Law authorizes a certificate of incorporation to contain a provision

> eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

89

8 *Del. C.* § 102(b)(7). An exculpatory provision shields the directors from personal liability for monetary damages for a breach of fiduciary duty, except liability for the four identified categories. "The totality of these limitations or exceptions . . . is to . . . eliminate . . . director liability only for 'duty of care' violations. With respect to other culpable directorial actions, the conventional liability of directors for wrongful conduct remains intact." 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 6.02[7], at 6-18 (2013 & Supp. Dec. 2019). An exculpatory provision therefore "will not place challenged conduct beyond judicial review." *Id.* at 6-19.

> When a corporation's certificate of incorporation contains an exculpatory provision,
>
> [a] plaintiff seeking only monetary damages must plead non-exculpated claims against a director who is protected by an exculpatory charter provision to survive a motion to dismiss, regardless of the underlying standard of review for the board's conduct—be it *Revlon*, *Unocal*, the entire fairness standard or the business judgment rule.

*Cornerstone*, 115 A.3d at 1175–76 (footnotes omitted). To state a claim against each individual director, a complaint must "plead[] facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith." *Id.* at 1179–80. "[E]ach director has a right to be considered individually," and "the mere fact that a director serves on the board of a corporation with a controlling stockholder does not automatically make that director not independent." *Id.* at 1182–83.

### 1.	Dorman and Green

As discussed above, this decision has held that for purposes of analysis under Rule 12(b)(6), it is reasonably conceivable that Dorman and Green lacked independence. For purposes of whether their conduct could rise to a breach of the duty of loyalty, including a failure to act in good faith, the plaintiffs also point to how they carried out their duties. Among other things:

- The Special Committee retained Evercore, a financial advisor with close ties to Mr. Dell and Silver Lake, without interviewing any other advisers, and under circumstances which suggest that Durban brokered the engagement.

- The Special Committee retained DISCERN, a one-man firm that appears from the complaint to have lacked the qualifications necessary to advise the Special Committee, whose predecessor entities had been forcibly evicted for failing to pay rent and which owed back taxes to the state of Delaware, and whose principal qualification appears to have been a close friendship with the Evercore lead banker.

- The Special Committee failed to use the Deloitte valuation to push back against the Company's inflated valuation for its Core Business.

- The Special Committee endorsed the Committee-Sponsored Redemption, then abandoned the field and became a passive instrumentality, content to wait while the Stockholder Volunteers negotiated a superior transaction.

- The Special Committee rubber stamped the Stockholder-Negotiated Redemption in a late-night, one-hour meeting.

- The Special Committee approved a proxy statement that contained a seemingly false and misleading depiction of their proposal of $125 per share.

Viewed as a whole, the pleading-stage record supports an inference that the members of the Special Committee could have acted disloyally or in bad faith by catering to the wishes of Mr. Dell and Durban. That is not the only inference, nor even the most persuasive

91

inference, but it is a possible inference to which the plaintiffs are entitled at the pleading stage.

### 2. Kullman

The complaint does not support a reasonable inference that Kullman acted disloyally or in bad faith. With Latham's assistance, Kullman identified a conflict early in the process and immediately recused herself. After her recusal, the complaint does not support an inference that she had any involvement in the negotiations. Kullman's involvement was limited to attending meetings of the Board, approving the issuance of the proxy materials, and approving the Stockholder-Negotiated Redemption.

The plaintiffs assert Kullman approved the Stockholder-Negotiated Redemption to advance the interests of Goldman Sachs because they would receive a success fee and she sat on their board of directors. That inference is unreasonable given the paucity of allegations relating to her involvement in the transaction. The plaintiffs also assert that Kullman "knowingly approved the issuance of false and misleading proxy materials," but the complaint's assertions are conclusory. Dkt. 117 at 81–82; *see* Dkt. 127 at 135. In light of her limited role in the transaction, it is not reasonably conceivable that Kullman could be held liable based on the events described in the complaint.

Because of the procedural stage of the case, Kullman's dismissal is necessarily an interlocutory ruling. "Prejudgment orders remain interlocutory and can be reconsidered at any time, but efficient disposition of the case demands that each stage of the litigation build on the last, and not afford an opportunity to reargue every previous ruling." *Siegman ex rel. Siegman v. Columbia Pictures Entm't, Inc.*, 1993 WL 10969, at *3 (Del. Ch. Jan. 15,

92

1993) (internal quotation marks omitted). If discovery shows that Kullman had a more significant and compromising role, then subject to the law of the case doctrine, the plaintiffs can seek to revisit her dismissal, should future developments provide a compelling reason for doing so. *See Zirn v. VLI Corp.*, 1994 WL 548938, at *2 (Del. Ch. Sept. 23, 1994) ("Once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears.").

## III. CONCLUSION

The complaint supports a reasonable inference that the defendants failed to comply with the requirements of *MFW*, resulting in entire fairness serving as the operative standard of review. Under this standard of review, the complaint states a claim on which relief can be granted. The complaint supports a reasonable inference that Dorman and Green could be held liable on non-exculpated claims. The complaint does not support a reasonable inference that Kullman could be held liable on a non-exculpated claim. The motions to dismiss are therefore denied except as to Kullman, whose motion to dismiss is granted.

93